No. 97,287

In the Matter of C. RICHARD COMFORT, *Respondent*.
(159 P.3d 1011)

Opinion filed June 8, 2007.

*Janith A. Davis*, deputy disciplinary administrator, argued the cause and was on the brief for petitioner.

*Ronald D. Smith*, of Smith, Burnett & Larson, LLC, of Larned, argued the cause and was on the brief for respondent, and *C. Richard Comfort*, respondent, argued the cause pro se.

*Per Curiam*: This is contested proceeding in discipline filed against Respondent C. Richard Comfort, an attorney licensed to practice law in Kansas since October 1981.

The hearing panel found violations of Kansas Rules of Professional Conduct (KRPC) 4.4 (2006 Kan. Ct. R. Annot. 488) (respect for rights of third persons) and KRPC 8.4(d) (2006 Kan. Ct. R. Annot. 510) (misconduct prejudicial to the administration of justice). A third alleged violation of KRPC 8.3 (2004 Kan. Ct. R. Annot. 509) (failure to report) was dismissed.

This action arises out of Respondent's representation of Cloud County Development Corporation (CloudCorp), a for-profit, economic development corporation. CloudCorp had been involved in negotiations with Beldon Blosser, who had hoped to develop a portion of land he owned in Cloud County, Kansas. Blosser had secured CloudCorp's services, but disagreements arose between Blosser and CloudCorp regarding funding for the land's development, and they parted ways.

At about the same time, the City of Concordia (City) decided to construct a dam and reservoir. The City approached Blosser and sought to purchase a portion of his land for the dam and reservoir. The City and Blosser were unable to reach an agreement regarding the value of the land. City officials made it clear to Blosser that the City would seek condemnation of the land if necessary.

David Swenson, an attorney with Swenson, Brewer & Long, represented Blosser. In order to obtain information that CloudCorp and the City had acquired regarding the value of Blosser's land, Swenson and Blosser decided to propound a Kansas Open Records Act (KORA) request to CloudCorp. On February 13, 2004, Swenson prepared two open records requests for information—one directed to the City and one directed to CloudCorp.

Dana Brewer, Swenson's law partner, was a member of the Board of Directors of CloudCorp and served as CloudCorp's legal counsel. Swenson gave a copy of the requests to Brewer. The requests were then served on the afternoon of Friday, February 13, 2004. On February 14, Swenson left for a 10-day vacation.

After CloudCorp received the request, Brewer discussed the matter with Kirk Lowell, CloudCorp's executive director. Brewer informed Lowell that, because Brewer's law partner had sent the request, Brewer could not advise CloudCorp on its response. CloudCorp then retained Respondent to assist it on that matter.

On February 18, 2004, Respondent wrote a letter to Swenson. Respondent admits authoring and publishing this letter, although it was signed by his partner, Scott R. Condray, who ultimately served as Respondent's counsel early in this disciplinary proceeding. The letter stated in pertinent part:

"Swenson, Brewer & Long Chartered Law Office (Firm) has a long history of representing CloudCorp especially since the early 1990s. Over the years the Firm has provided legal services to CloudCorp both for fee and pro bono . . . .

. . . .
"Mr. David E. Swenson is a member of the Firm. The very unprofessional actions toward CloudCorp by Mr. Swenson and his client on February 13, 2004 [have] put the Firm and Mr. Brewer in a very precarious environment in which the Firm serves its clients.

. . . .
"CloudCorp has been trying to reach Mr. Swenson through the Firm since Friday the 13th concerning this matter. However it appears to CloudCorp that Mr. Swenson conveniently left Concordia . . . after serving CloudCorp with the public information request while CloudCorp's Executive Director was at a Rotary Luncheon meeting.

"CloudCorp is convinced that inappropriate professional behavior unconfronted never changes.

. . . .

"CloudCorp has willfully provided an environment of public, operational and confidential information to the Firm in which Mr. Swenson and his client, both having an unfavorable relationship to CloudCorp, could 'sneak a peak' at CloudCorp information and use this information to take adverse action, at the direction of the Firm's other client, toward CloudCorp.

"Because of the above stated items, you are hereby put on notice that this Request is inappropriate as you have a conflict of interest in making this Request . . . ."

Respondent's letter then recited the full text and comments to KRPC 1.7 (2006 Kan. Ct. R. Annot. 411) and KRPC 1.10 (2006 Kan. Ct. R. Annot. 423). The letter closed with: "Please advise that you are withdrawing both your Requests due to the conflict of interest."

Respondent sent a copy of the letter to the City Manager, the City Attorney, the City Clerk and Public Information Officer, and five City Commissioners. This dissemination of the letter led to certain of Swenson's clients becoming aware of its content. When the letter arrived at Swenson's office, he was still out of town. He did not return until February 24, 2004, and became aware that CloudCorp and Respondent believed he had a conflict in representing Blosser the following day. Swenson then told Blosser that Blosser would need to find another attorney to represent him regarding the records requests.

On February 27, 2004, Respondent wrote to Swenson again, stating:

"Inasmuch as you have not favored this office with a reply to our missive of February 18, 2004, I have been directed to seek closure herein or my client will be required to pursue additional remedies, both civil (malpractice) and administrative (Disciplinary Administrator's Office.)

"My client, also your firm's client, is extremely upset that you have not responded to CloudCorp's repeated verbal and written overtures to resolve this matter. It appears that you do not professionally respect CloudCorp as a client of your firm. Your failure or refusal to return Mr. Lowell's phone calls since February 13, 2004, resulted in moving this matter from something that could have been resolved privately in your respective offices into the public domain and into a much more serious and public review of the legal and ethical propriety of your request.

. . . .

"In addition, your actions have jeopardized the valued professional relationship and friendship between a member of your firm, Dana Brewer, Esquire, and his

client CloudCorp. However, my client is **emphatic** that you will not be allowed to use CloudCorp's relationship with Dana Brewer to extort and continue this conflict of interest while presenting a clear and present danger to CloudCorp's community economic development efforts. CloudCorp will continue to honor the professional relationship with your firm, as well as the personal relationship between Dana Brewer and Kirk Lowell.

"Because of your reckless acts, a great deal of unnecessary strain has been created within CloudCorp, between CloudCorp and your firm, and between numerous individuals therein, who had close personal and professional relationships. . . .

"Therefore I have been instructed by our mutual client to insist that you immediately withdraw and retract your Request for Public Information of [February 13, 2004] and notify this office as such in writing. **IMMEDIATELY HEREIN ABOVE, MEANS UPON RECEIPT OF THIS LETTER BY YOUR FIRM.**

"Finally, we demand that you cease and desist from representing the interests of any other clients of your firm whose interests may be in conflict with CloudCorp.

"Your failure to promptly resolve this matter as indicated herein will result in CloudCorp taking the actions set forth herein above against you, Mr. David Swenson, Attorney at Law."

On March 1, 2004, Swenson spoke to Respondent by phone. During the telephone conversation, Swenson orally withdrew the open records request. (Since that time, Swenson has taken no further action on the matter.) According to Respondent, Swenson also offered to self-report his conflict of interest to the Disciplinary Administrator. Swenson denies doing so.

On March 2, 2004, Swenson responded in writing to Respondent's two letters. Swenson also filed a complaint with the Disciplinary Administrator about Respondent's conduct. A week later, Respondent reported Swenson to the Disciplinary Administrator.

On May 17, 2006, the Disciplinary Administrator filed a formal complaint against Respondent, alleging violations of KRPC 4.4, KRPC 8.3, and KRPC 8.4(d).

A hearing was held on June 29, 2006, before Presiding Officer Ruth E. Graham, Jo Ann Butaud, and Randall K. Rathbun. On August 28, 2006, the panel issued its final hearing report, which contained findings of fact substantially similar to those set out in the summary above.

The panel dismissed the KRPC 8.3 claim, because Respondent had eventually reported Swenson to the Disciplinary Administra-

tor. After an investigation, the Disciplinary Administrator's office determined that Swenson did not have a conflict of interest when he propounded the open records request to CloudCorp on Blosser's behalf, because CloudCorp's interests and Blosser's interests were not materially adverse.

The hearing panel concluded that Respondent violated KRPC 4.4, which provides: "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person." In the panel's view, "when the Respondent published the February 18, 2004, letter to various members of the Concordia community, he had no valid substantial legal purpose, other than to embarrass Mr. Swenson."

The panel detected irony in Respondent's assertion in his February 27, 2004, letter that Swenson's failure to respond to the February 18 letter forced Respondent to "mov[e] this matter from something that could have been resolved privately in [their] respective offices into the public domain." In fact, the panel noted, it was Respondent who had taken the matter to "the public domain" by delivering the February 18 letter to various community members. Moreover, the panel members believed that Respondent had failed to give Swenson an adequate opportunity to respond.

The panel also concluded that Respondent violated KRPC 8.4(d), which states: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." According to the panel, Respondent engaged in conduct prejudicial to the administration of justice when he published the February 18 letter to various members of the community. In doing so, he interfered with Blosser's open records request; the panel stated explicitly that "[t]he prosecution of the open records request was halted by Respondent's antics."

Regarding its recommended discipline, the panel considered the following factors pursuant to Standard 3 from the American Bar Association's Standards for Imposing Lawyer Sanctions (1991) (Standards):

"*Duty Violated*. The Respondent violated his duty to the legal system and the legal profession to refrain from abusing the process.

"*Mental State*. The Respondent knowingly violated his duty.

"*Injury*. As a result of the Respondent's misconduct, the Respondent caused actual harm. Mr. Swenson testified that at least one client terminated his services based upon the letter written and published by the Respondent. As a result, the Respondent's misconduct caused Mr. Swenson actual harm."

## The panel found the following aggravating factors present:

"Prior Disciplinary Offenses. The Respondent has been previously disciplined on three occasions.

"On September 10, 1991, a Hearing Panel of the Kansas Board for Discipline of Attorneys conducted a hearing regarding allegations that the Respondent engaged in misconduct. The Hearing Panel concluded that the Respondent violated DR7-102(B)(1) [failure to reveal fraud perpetrated by client to court and affected parties] and DR1-102(A)(5) [conduct prejudicial to the administration of justice].
. . .

"On June 10, 1997, the Disciplinary Administrator informally admonished the Respondent for having violated MRPC 1.11 [representing a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer].

"On January 28, 1998, a Hearing Panel of the Kansas Board for Discipline of Attorneys conducted a hearing regarding allegations that the Respondent engaged in misconduct. The Hearing Panel concluded that the Respondent violated MRPC 8.4(b) [committing a criminal act reflecting adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects] and MRPC 8.4(d) [conduct adversely reflecting on fitness to practice law].

"A Pattern of Misconduct. By forwarding a copy of the letter to eight members of the Concordia community, the Respondent engaged in a pattern of misconduct.

"Refusal to Acknowledge Wrongful Nature of Conduct. Throughout the disciplinary process, the Respondent refused to acknowledge the wrongful nature of his conduct.

"Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to practice law in 1981. At the time Respondent engaged in misconduct, the Respondent had been practicing law for more than twenty years. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time he engaged in misconduct."

## The panel also considered the following mitigating factor:

"Remoteness of Prior Offenses. The discipline imposed in 1991, 1997, and 1998, is remote in time and in character to the misconduct in this case."

The panel noted that none of the standards for imposing lawyer sanctions fit Respondent's situation precisely. The Deputy Disciplinary Administrator recommended published censure. Counsel for Respondent argued that Respondent had committed no violation and recommended that the panel dismiss the complaint.

Based on its findings of fact, conclusions of law, and the aggravating and mitigating factors it considered, the panel unanimously recommended that Respondent be censured by the Kansas Supreme Court and that the censure be published in the Kansas Reports. The panel assessed costs against Respondent.

### Respondent's Exceptions

Respondent generally accepts the facts as set out in the final hearing report, although he urges the court to clarify certain characteristics of his client, CloudCorp. The corporation was created by a lawyer from Swenson, Brewer & Long; that firm had been CloudCorp's longtime counsel. Respondent asserts that CloudCorp, although set up as a nonpublic entity, was concerned about being characterized as a public entity. It received one-third of its funding from the City, and a City Commission member sat on CloudCorp's board. According to Respondent, the company desired to avoid the perception that its "alliances with local government funding might make [it a] quasi-public entity subject to open records requests." Respondent and Lowell thus perceived the open records requests from Swenson as threatening to the nonpublic nature of the company, particularly when they were directed at CloudCorp by a lawyer in the firm that had assisted in setting up the company. Respondent asserts that the requests on behalf of Blosser also conflicted with CloudCorp's interests because they sought disclosure of confidential information.

Respondent also emphasizes that the rules governing KORA requests give a public entity only 72 hours to respond before penalties begin to accrue under K.S.A. 45-215 *et seq.* Respondent argues that the February 18 letter was an attempt to protect his client and to alert all affected parties that the request was invalid.

Respondent also takes issue with the panel's characterization of his February 18 letter as "vitriolic," asserting that, contrary to the

panel's statement that the letter accused Swenson of engaging in unethical conduct: "[t]he word 'unethical' is not used anywhere in Respondent's letter." However, regardless of the exact language in the letter, Respondent consistently testified that, when he wrote it, he believed Swenson had acted unethically in propounding the open records request to CloudCorp.

### Analysis

In attorney disciplinary proceedings, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties, and determines whether violations of KRPC exist. If they do, the court considers the discipline to be imposed. Any attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence. *In re Lober,* 276 Kan. 633, 636, 78 P.3d 442 (2003).

We view the findings of fact, conclusions of law, and recommendations made by the disciplinary panel as advisory only, but we give the final hearing report the same dignity as a special verdict by a jury or the findings of a trial court. Thus the disciplinary panel's report will be adopted where amply sustained by the evidence, but not where it is against the clear weight of the evidence. When the panel's findings relate to matters about which there was conflicting testimony, this court recognizes that the panel, as the trier of fact, had the opportunity to observe the witnesses and evaluate their demeanor. Therefore, we do not reweigh the evidence or pass on credibility of witnesses. *Lober,* 276 Kan. at 636-37. We merely examine any disputed findings of fact and determine whether clear and convincing evidence supports the panel's findings. *In re Kellogg,* 269 Kan. 143, 153, 4 P.3d 594 (2000). If so, the findings will stand. We need not restate the entire record to show substantial competent evidence to support the panel's findings. *Kellogg,* 269 Kan. at 153.

### Preliminary Arguments

Respondent first argues that, based on the facts known to him, he was justified in his belief that Swenson had a conflict of interest. This belief was evidenced not only by the content of his letters but also by his March 9, 2004, report of Swenson to the Disciplinary

Administrator. The Administrator, after an investigation, concluded there was, in fact, no conflict. Although we need not accept the Administrator's finding that there was no conflict, we do not consider Respondent's argument to be material to the disposition of his disciplinary case. At issue in this proceeding is not whether Respondent was justified in believing a conflict existed, but whether his conduct, based on that belief, violated the Kansas Rules of Professional Conduct. Given the irrelevance of Respondent's subjective or objective view of the conflict issue, we need not address his assertion that his right to due process was infringed when the hearing panel limited testimony on this topic.

### KRPC 4.4

KRPC 4.4 (2006 Kan. Ct. R. Annot. 488) provides that, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."

Respondent urges us to reject the panel's conclusion that he violated this rule by publishing his February 18, 2004, letter to various City employees. He asserts that (1) the panel applied the wrong standard in evaluating the alleged violation; (2) the rule is limited in scope to protecting the rights of lay persons, not fellow lawyers; and (3) there was a substantial purpose for publishing the letter other than to embarrass Swenson. We address these arguments in this order.

Applicable Standard

Respondent insists that the standard to be applied under the rule to determine whether there was a "substantial purpose other than to embarrass, delay, or burden" Swenson should be a purely subjective one, evaluating only Respondent's personal view of the situation at hand. When we apply this standard, he further argues, we are required to resolve all facts and inferences in Respondent's favor. Here, when the panel inquired about Respondent's motive, he testified his action was a "legal check" designed to eliminate the KORA request and get Swenson to change his position.

Respondent cites a District of Columbia case in support of a subjective standard, *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1483 (D.C. Cir. 1995). It, according to him, stands for the proposition that, when evaluating a claim of misconduct under such a "respect for third-parties" rule, the question of "whether attorney behavior is unprofessional depends . . . *on the attorney's perspective*, that is, on whether . . . the attorney has 'no substantial purpose other than to embarrass, delay, or burden a third person.' " (Emphasis added.) *Shepherd*, 62 F.3d at 1483.

*Shepherd* cannot bear the burden Respondent would have us place upon it. In that case, the trial court sanctioned a defendant company because its outside attorney had "harassed a witness." In reaching this conclusion, the court relied solely on the witness' testimony that she felt threatened and "cornered." 62 F.3d at 1483-84. On review, the Circuit Court of Appeals for the District of Columbia reversed the sanction because the attorney testified that it was his style to try to talk to witnesses face-to-face and that, when the witness said she did not want to talk, the attorney pursued her no further. The appellate court's analysis, contrary to Respondent's reading of it, implies that the standard for evaluating misconduct should be an objective one, *i.e.*, the reasonableness of the attorney's actions under the peculiar facts and circumstances of the case, rather than a subjective one based solely on either the attorney's perspective or the third party's perspective.

We hold that Respondent's subjective motive or purpose is relevant but not finally determinative in our evaluation of whether Rule 4.4 was violated. See *In re Royer*, 276 Kan. 643, 649, 78 P.3d 449 (2003) (in order to determine whether attorney's action had substantial purpose other than to embarrass, delay, burden third person, attorney's motive for engaging in action relevant); *In re Levine*, 174 Ariz. 146, 153, 847 P.2d 1093 (1993) (when Respondent asserts objectively arguable ground for legal claim exists, Respondent's subjective purpose in bringing action relevant to determine whether rule violated).

The Rules of Professional Conduct are just that: general standards of conduct and practice required of those admitted to the

bar in Kansas. See Rule 226 (2006 Kan. Ct. R. Annot. 351). A lawyer cannot escape responsibility for a violation based on his or her naked assertion that, in fact, the "substantial purpose" of conduct was not to "embarrass, delay, or burden" when an objective evaluation of the conduct would lead a reasonable person to conclude otherwise. We believe the panel evaluated Respondent's conduct in the unique circumstances of this case appropriately.

## Scope of KRPC 4.4

Respondent's next argument—that KRPC 4.4's protections apply only to the rights of lay persons and not fellow lawyers—is without merit. Chapter 4 of the KRPC's specifically applies to "Transactions with Persons Other than Clients." "Persons other than Clients" obviously can include fellow lawyers, even when they are serving as counsel for another or an opposing party in a legal interaction, transaction, or litigation. Moreover, although KRPC 4.4 is often applied to protect nonclient witnesses and unrepresented or opposing parties, see comment to KRPC 4.4, the rule also has been applied by this court in the attorney-to-attorney context. See *In re Landrith*, 280 Kan. 619, 635, 124 P.3d 467 (2005) (attorney disciplined for, *inter alia*, KRPC 4.4 violations based on abuses directed at opposing counsel, other attorneys, judges, judicial staff); *In re Pyle*, 278 Kan. 230, 240, 91 P.3d 1222 (2004) (*Pyle I*) (attorney disciplined for KRPC 4.4 violation based on letter to opposing counsel). As the Disciplinary Administrator notes here, other jurisdictions also have applied this rule to control conduct aimed at opposing counsel. See *In re Estiverne*, 741 So. 2d 649, 653 (La. 1999) (offensive letter to judge, physical threat to opposing counsel with firearm warrants discipline under [Rule 4.4]); *In re Belue*, 232 Mont. 365, 369-70, 376, 766 P.2d 206 (1988) (physical attack on opposing counsel, repeated filing of frivolous ethics complaints against opposing counsel warrants discipline under [Rule 4.4]). Although we recognize that it is prudent to tread carefully when regulating the amount of zeal exhibited in representation of a Kansas attorney's client, we again believe the panel struck an appropriate balance in this case.

## Substantial Purpose Other than Embarrassment

The essence of Respondent's argument on this point is that, while his letter was "admittedly, sharply-worded," it was not, as the panel characterized it, "vitriolic." Further, in his view, the letter had a "substantial purpose" to "get Swenson's attention and [persuade him to] recall the KORA request affecting CloudCorp." Respondent stresses he sent the February 18 letter and published it to City officials at the express direction of his client. We note that, when Respondent was asked at the panel hearing about his objective for the two letters, he said, "I didn't have any objective. The client's objective was the paramount consideration. He wanted a simple written withdrawal of the open records request."

This effort to shift our focus from Respondent's objective in adopting and pursuing a particular method to Respondent's client's ultimate legal objective does not insulate Respondent from a conclusion that he violated KRPC 4.4. The advocacy to which a client and the client's legal position is entitled cannot enable or justify an attorney in violating ethical restraints to which he or she is subject. "The client made me do it" is not a valid defense. There are times when an attorney's only ethical duty is to tell a client "no" or, perhaps, "your legal objective is valid, but I am ethically bound to pursue it through a different means."

Here, it appears that Respondent and his client had legitimate objectives. They wanted to inform Swenson that they did not believe CloudCorp, as a private entity, was subject to KORA, and they wanted to tell Swenson that they believed his representation of Blosser on the KORA request was a conflict of interest. However, there is clear and convincing evidence supporting the panel's ultimate conclusion that the *means* Respondent used to accomplish these ends served no substantial purpose other than to embarrass Swenson. See *In re Royer*, 276 Kan. at 649 (existence of legitimate objective does not preclude application of rule where means served no substantial purpose other than to burden).

At the hearing, CloudCorp's Executive Director Lowell referred to the February 18 letter as a "bomb." Respondent dropped this bomb by publishing the letter to City officials, accusing Swenson

of committing serious violations of the Kansas Rules of Professional Conduct; of "conveniently" leaving town; of "willfully" creating an environment in which Swenson could "sneak a peek" at CloudCorp files in his law firm to facilitate action adverse to CloudCorp in the interest of Blosser. Respondent later accused Swenson of "fail[ing] or refus[ing]" to resolve the matter and threatened civil and disciplinary action against Swenson if Swenson did not immediately withdraw the KORA requests. Swenson testified that, in the 33 years of his law practice, he had "never seen a letter like this" that "accused another lawyer—and without any real basis for doing so—of things like, you know, being a spy, and doing things that I felt they had absolutely no basis for making those allegations. And just deriding me professionally and personally. Yes, I was—I was insulted. . . . I felt like I had been slandered."

Respondent argues that the panel created "a new actionable element without prior notice of the rule change" by basing its conclusion on the *publication* of the letter. We disagree. The rule clearly proscribes conduct, and the dissemination or publication of a letter designed to embarrass is a "means" explicitly contemplated by the rule. The panel's decision that Respondent's conduct in publishing the letter, as distinct from the content of the letter alone, violated KRPC 4.4 is legally sound.

*In re Pyle* is instructive on this point. In that case, this court concluded that E. Thomas Pyle III's action of sending a letter threatening to report opposing counsel to the Disciplinary Administrator if opposing counsel did not settle an underlying lawsuit, constituted use of his belief in a potential ethical violation "as a tool to gain a better bargaining position in the lawsuit." We stated that, in such circumstances, "there was clear and convincing evidence that Pyle sent a letter that had 'no substantial purpose other than to embarrass, delay, or burden' " opposing counsel in violation of KRPC 4.4. *In re Pyle*, 278 Kan. at 241.

Given all of the above, we adopt the hearing panel's conclusion that, by *publishing* the February 18 letter, Respondent served no substantial purpose other than to embarrass Swenson. This conclusion is supported by the clear weight of the evidence in the record.

## *KRPC 8.4(d)*

KRPC 8.4(d) states: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice."

Respondent argues that the hearing panel erred by concluding that he engaged in conduct prejudicial to the administration of justice when he published the February 18 letter to various members of the community. Specifically, the panel decided that Respondent interfered with Blosser's effort to obtain public documents: "[R]espondent's antics" "halted . . . [t]he prosecution of the open records request."

Respondent challenges this decision, arguing that Rule 8.4(d) cannot be violated without violation of another rule and that, even if it can be violated in isolation, the Disciplinary Administrator did not meet the burden of proof.

First, we need not fully discuss Respondent's argument that a violation of the general misconduct rules in KRPC 8.1 through KRPC 8.4 must accompany violation of another disciplinary rule. As discussed above, we agree with the panel that Respondent violated KRPC 4.4. We pause only to note that our prior cases have required no predicate violation of another rule to support a violation of KRPC 8.1 through 8.4. See *In re Gooding*, 260 Kan. 199, 917 P. 2d 414 (1996) (attorney suspended for violations of 8.4[b], [d], and [g]); *In re Robertson*, 256 Kan. 505, 886 P.2d 806 (1994) (attorney censured for violations of MRPC 8.4[b], [d], and [g]); *In re Pyle*, 283 Kan. 807, 827-32, 156 P.3d 1231 (2007) (*Pyle II*) (Supreme Court found a violation of KRPC 8.4[d]). The fact that the violations of the general misconduct rules have accompanied violations of other rules in these cases was serendipitous, not preordained.

To support his other argument that the Disciplinary Administrator failed to meet the burden of proof on violation of Rule 8.4(d), Respondent directs us to *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 115 L. Ed. 2d 888, 111 S. Ct. 2720 (1991), and *Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430 (9th Cir. 1995). He believes these

cases dictate that the Disciplinary Administrator affirmatively show a "clear and present danger" or "substantial likelihood of material prejudice to an adjudicative proceeding" to prove Rule 8.4(d)'s "conduct that is prejudicial to the administration of justice."

These cases are readily distinguishable and otherwise unpersuasive.

*Gentile* concerned a rule of the Nevada Supreme Court prohibiting lawyers from making extrajudicial statements to the press that the lawyer knew or reasonably should have known would have a "substantial likelihood of materially prejudicing" an adjudicative proceeding. 501 U.S. at 1030-31. The Kansas rule at issue here does not contain this standard. Compare KRPC 8.2(a).

In *Yagman*, California Local Rule 2.5.2 enjoined an attorney from engaging in any conduct that "degrades or impugns the integrity of the Court," and provided that "[n]o attorney shall engage in any conduct which . . . interferes with the administration of justice." 55 F.3d at 1436. The Ninth Circuit Court of Appeals noted that speech otherwise entitled to full constitutional protection may nonetheless be sanctioned if it obstructs or prejudices the administration of justice, but that "[p]ress statements relating to judicial matters may not be restricted . . . unless they pose a 'clear and present danger' to the administration of justice." *Yagman*, 55 F.3d at 1442. The *Yagman* holding has been rejected by other jurisdictions. See *Matter of Palmisano*, 70 F.3d 483, 487 (7th Cir. 1995) (*Yagman* inconsistent with United States Supreme Court and Seventh Circuit precedent); *In re Wisehart*, 281 App. Div. 2d 23, 31, 721 N.Y.S.2d 356 (2001) (rejecting *Yagman*; attorney's false, scandalous attacks not protected under First Amendment); *In re Shearin*, 765 A.2d 930, 938 (Del. 2000) (*Yagman* inconsistent with Delaware court's holdings on lawyer speech). And we have not previously applied this standard to evaluate an alleged KRPC 8.4(d) violation. See, *e.g.*, *In re Wiles*, 283 Kan. 173, 179, 150 P.3d 859 (2007) (engaged in conduct prejudicial to administration of justice when failed to comply with discovery requests and to respond to motions); *In re Lazzo*, 283 Kan. 167, 169-70, 150 P.3d 887 (2007) (engaged in conduct prejudicial to administration of justice by filing client's petition for name change without disclosing client's

criminal conviction; name change designed to elude Colorado authorities); *In re Brunton*, 282 Kan. 423, 426, 144 P.3d 606 (2006) (engaged in conduct prejudicial to administration of justice by failing to amend bankruptcy plan that improperly sought discharge of client's restitution obligation).

The Deputy Disciplinary Administrator met the correct burden of proof to show "prejudice to the administration of justice" when she introduced uncontested evidence that Respondent's letters interfered with Blosser's open records request and that Respondent's threat of disciplinary action and widespread accusations of Swenson forced him to drop his request and his representation of Blosser. In fact, the Deputy Disciplinary Administrator showed actual harm to Swenson, putting on evidence that he lost clients after the content of the letters became known. The hearing panel's conclusion that Respondent violated KRPC 8.4(d) is amply supported by the evidence in the record.

### *Constitutionality of KRPC 4.4 and 8.4(d) As Applied*

Respondent also argues that, under the facts of this case, the two rules he is charged with violating are unconstitutionally vague and overbroad, the second infirmity arising because the rules infringe upon the lawful exercise of his rights under the First Amendment to the United States Constitution and § 11 of the Kansas Constitution Bill of Rights.

We analyze the constitutionality of rules promulgated by this court in the same fashion that we analyze statutes passed by the legislature. Generally, the question of whether a statute is constitutional is a question of law over which an appellate court has unlimited review. The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be struck down, it must clearly appear that it violates the constitution. In determining constitutionality, it is a court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, unless its infringement of the superior law is clear beyond reasonable doubt, it should be upheld. *City of Wichita v. Hackett*, 275 Kan.

848, 853, 69 P.3d 621 (2003); *State v. Whitesell,* 270 Kan. 259, Syl. ¶ 1, 13 P.3d 887 (2000).

## Vagueness

We use a two-part test to determine whether a statute is unconstitutionally vague. First, we consider whether the statute conveys a sufficiently definite warning of the proscribed conduct when measured by common understanding and practice. Next, we consider whether the statute adequately guards against arbitrary and discriminatory enforcement. The second part of the test embodies the requirement that a legislature establish minimal guidelines to govern law enforcement. *State v. Rupnick,* 280 Kan. 720, 737, 125 P.3d 541 (2005). We are interested in whether the language of the provision conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. A statute that either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process. *State v. Rose,* 234 Kan. 1044, 1045-46, 677 P.2d 1011 (1984); *State v. Lackey,* 232 Kan. 478, 479, 657 P.2d 40 (1983); *State v. Carpenter,* 231 Kan. 235, 237, 642 P.2d 998 (1982); *State v. Huffman,* 228 Kan. 186, 192, 612 P.2d 630 (1980); *State v. Norris,* 226 Kan. 90, 91-92, 595 P.2d 1110 (1979); *Kansas City Millwright Co., Inc. v. Kalb,* 221 Kan. 658, 663, 562 P.2d 65 (1977). A statute is not invalid for vagueness or uncertainty where it uses words of commonly understood meaning. *State v. Rose,* 234 Kan. at 1046; *In re Brooks,* 228 Kan. 541, 544, 618 P.2d 814 (1980); *Kansas City Millwright,* 221 Kan. at 663. At its heart, the test for vagueness is a common-sense determination of fundamental fairness. *Hearn v. City of Overland Park,* 244 Kan. 638, 642, 772 P.2d 758 (1989).

This case involves an administrative action, *i.e.,* a disciplinary action, not a criminal offense. In evaluating constitutional challenges for vagueness, courts afford greater leeway to provisions regulating business than to those proscribing criminal conduct. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 31 L. Ed. 2d 110, 92 S. Ct. 839 (1972); *In re Brooks,* 228 Kan. at 544.

With regard to KRPC 4.4, Respondent argues that the words "embarrass," "delay," and "burden" have no settled usage, and thus the rule "fails to provide fair notice to those to whom it is directed of the prohibited activity and is so imprecise that discriminatory enforcement is a real possibility."

We disagree. The words "embarrass," "delay," and "burden" have a "commonly understood meaning." *State v. Rose,* 234 Kan. at 1046; *In re Brooks,* 228 Kan. at 544. In addition, they have been interpreted repeatedly in the context of attorney discipline proceedings. See, *e.g., In re Eastepp,* 281 Kan. 698, 699, 132 P.3d 918 (2006) (attorney's numerous untrue filings had no substantial purpose other than to embarrass, delay, or burden); *Pyle,* 278 Kan. at 240-42 (under similar facts, although violation of 4.4 and 8.4[d] not alleged in formal complaint, Respondent on notice these rules implicated by his actions); *In re Royer,* 276 Kan. 643, 649, 78 P.3d 449 (2003) (attorney facilitated fraudulent transfer of property; substantial purpose was to burden City); *In re Black,* 262 Kan. 825, 829, 941 P.2d 1380 (1997) (angry outburst criticizing opposing party; no substantial purpose other than to embarrass, delay, burden).

Moreover, when appropriate emphasis is put on KRPC 4.4's use of the word "means," the language gives fair warning that the reasonableness of a lawyer's choice of method to reach an end is at the heart of any analysis. Again, Respondent's publication of the February 18 letter was the problem here, not merely its content.

With regard to KRPC 8.4(d), Respondent argues that "like other rules," it "is a simplistic standard that warns nobody of what hidden layer of discipline awaits them."

We have previously rejected the claim that the language of KRPC 8.4(d) sets up a "vague and loose standard." See *In re Anderson,* 247 Kan. 208, 212, 795 P.2d 64 (1990), *cert. denied* 498 U.S. 1095 (1991); *State v. Nelson,* 210 Kan. 637, 640, 504 P.2d 211 (1972). In these earlier cases, respondents advanced the same vagueness argument with regard to identical language in MPRC 8.4(d) and DR 1-102(A)(5). We said:

"The word 'prejudicial' is universally found throughout the legal and judicial system. Specific definitions are found in any dictionary. In *Prunty v. Light Co.,* 83

Kan. 541, 108 Pac. 802 (1910), this court, referring to Webster's Universal Dictionary, defined prejudicial as 'hurtful,' 'injurious,' 'disadvantageous.' It cannot be seriously contended that 'prejudicial' does not sufficiently define the degree of conduct which is expected of an attorney." *Nelson*, 210 Kan. at 639-40.

As the Disciplinary Administrator notes, *Nelson* remains sound authority in Kansas. See *Pyle II*, 283 Kan. at 822-23; *In re Anderson*, 247 Kan. at 212.

In light of the foregoing discussion, we reject Respondent's vagueness challenge to KRPC 4.4 and KRPC 8.4(d).

Overbreadth and Free Speech

" 'While a vague statute leaves persons of common intelligence to guess at its meaning, an overbroad statute makes conduct punishable which under some circumstances is constitutionally protected.' [Citations omitted.]" *State v. Whitesell*, 270 Kan. at 270 (quoting *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 533, 646 P.2d 1091 [1982]). Respondent argues that enforcement of KRPC 4.4 and KRPC 8.4(d) in this case demonstrates the overbreadth of the rules, because it violates his rights under the First Amendment to the United States Constitution and like freedoms protected by § 11 of the Kansas Constitution's Bill of Rights.

The First Amendment states that Congress shall make no law abridging the freedom of speech. Section 11 of the Kansas Constitution Bill of Rights states each person may freely speak, write, or publish their sentiment on all subjects, "being responsible for the abuse of such rights."

We first observe that, by their express language, KRPC 4.4. and KRPC 8.4 regulate conduct, not speech. Further, respondent's conduct in sending the February 18 and follow-up letter did not qualify as symbolic speech, such as the wearing of a black armband or a sit-in or picketing. See, *e.g., Tinker v. Des Moines School Dist.*, 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969) (wearing black arm bands); *Brown v. Louisiana*, 383 U.S. 131, 15 L. Ed. 2d 637, 86 S. Ct. 719 (1966) (participating in silent sit-in); *Thornhill v. Alabama*, 310 U.S. 88, 84 L. Ed. 1093, 60 S. Ct. 736 (1940) (peaceful picketing). We realize, however, that in this case, our discipline of Respondent for publication of his February 18 letter is tied to

and in part dependent upon the letter's content. If the letter's statements about Swenson had been flattering or neutral, Respondent's choice to publish the letter could not have embarrassed Swenson and probably would not have prejudiced the administration of justice. We acknowledge this content link and appreciate that regulation of the content of that speech must be carefully drawn and fairly enforced.

Still, both the United States Supreme Court and this court have previously recognized that the freedom of speech is not inevitably without limitation. Lawyers, in particular, trade certain aspects of their free speech rights for their licenses to practice. See *Snyder*, 472 U.S. 634, 643, 86 L. Ed. 2d 504, 105 S. Ct. 2874 (1985); *Pyle II*, 283 Kan. at 822-23; *In re Johnson*, 240 Kan. 334, 335, 729 P.2d 1175 (1986).

*In re Johnson* was a contested disciplinary case in which we sanctioned respondent for false and unsupported criticism of and misleading statements about his opponent in a county attorney election campaign. We stated:

"A lawyer, as a citizen, has a right to criticize a judge or other adjudicatory officer publicly. To exercise this right, the lawyer must be certain of the merit of the complaint, use appropriate language, and avoid petty criticisms. Unrestrained and intemperate statements against a judge or adjudicatory officer lessen public confidence in our legal system. Criticisms motivated by reasons other than a desire to improve the legal system are not justified." *In re Johnson*, 240 Kan. at 336.

A lawyer also cannot insulate himself or herself from discipline by characterizing questionable statements as opinions. See *Pyle II*, 283 Kan. at 821; *Johnson*, 240 Kan. at 339.

"Upon admission to the bar of this state, attorneys assume certain duties as officers of the court. Among the duties imposed upon attorneys is the duty to maintain the respect due to the courts of justice and to judicial officers. A lawyer is bound by the Code of Professional Responsibility in every capacity in which the lawyer acts, whether he is acting as an attorney or not, and is subject to discipline even when involved in nonlegal matters, including campaigns for nonjudicial public office. *State v. Russell*, 227 Kan. 897, 610 P.2d 1122, *cert. denied* 449 U.S. 983 (1980)." *In re Johnson*, 240 Kan. at 337.

In *In re Landrith*, 280 Kan. 619, 124 P.3d 467 (2005), we rejected the argument that the First Amendment protected a law-

yer's repeated baseless, inflammatory, and false accusations against opposing counsel, judges, state district court employees, Court of Appeals staff, and municipal officers and employees. 280 Kan. at 631-34, 638-39, 644. We reiterated our previous holding that, in those instances where a lawyer's unbridled speech amounts to misconduct that threatens a significant state interest, the State may restrict the lawyer's exercise of personal rights guaranteed by the federal and state constitutions. See *N.A.A.C.P. v. Button*, 371 U.S. 415, 438, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963).

Most recently, in *Pyle II*, 283 Kan. 807, we navigated the tension between First Amendment freedoms enjoyed by all citizens and the limits that can be placed on the exercise of those freedoms when a person chooses to become a Kansas lawyer. In that case, an attorney reacted to his published censure in an earlier disciplinary case by publishing a letter to 281 clients, friends, and family members, in which he again took issue with whether he had violated any rules and whether he was deserving of any punishment; portrayed members of the Board of Discipline as lackeys for the insurance industry and susceptible to improper influence; indicated that the hearing panel had erred in its report; communicated that he disagreed with the panel's findings, which had been accepted by this court; explained his animosity toward the insurance industry and theorized that the particular insurance company involved in the litigation underlying his discipline had brought pressure to bear on the Disciplinary Administrator, the Disciplinary Board, and/or this court to make sure he was punished for his legitimate advocacy; and, finally, minimized the significance of his published censure as a "public 'slap on the wrist' " with no effect on his practice.

We imposed a 3-month suspension based on a violation of KRPC 8.4(d), holding that the "administration of justice" Rule 8.4(d) sought to protect from prejudice was much broader than the administration of justice to be effected in any single trial or adjudicatory proceeding and that it could be violated by conduct unbecoming an officer of the court, even if a particular legal proceeding had ended and even if the lawyer stopped somewhere short of spreading outright lies. *Pyle II*, 283 Kan. at 827-31; see also *Mich-*

*igan Grievance Administrator v. Fieger*, 476 Mich. 231, 719 N.W.2d 123 (2006), *cert. denied*, 127 S. Ct. 1257 (2007) (attorney's comments violated disciplinary rule prohibiting undignified, discourteous conduct toward tribunal, rule requiring respect toward all persons involved in legal process; rules not unconstitutionally vague or overbroad).

In his discussion of overbreadth, Respondent cites three cases in which an attorney wrote something and was sanctioned, and then the sanction was reversed by an appellate court: *In re Snyder*, 472 U.S. at 647; *United States v. Wunsch*, 84 F.3d 1110, 1120 (9th Cir. 1996); *In re Finkelstein*, 901 F.2d 1560, 1565 (11th Cir. 1990). Each of these cases is readily distinguishable.

In *Snyder*, an attorney had declined to submit further documentation in support of a request for attorney fees under the Criminal Justice Act; refused to accept further assignments under the Act; and criticized the administration of the Act. The Eighth Circuit Court of Appeals suspended him from practice in all courts of the Eighth Circuit for 6 months for disrespect. The United States Supreme Court reversed, holding: (1) The attorney's refusal to submit further documentation in support of the fees request, while it could form the basis for declining to award a fee, did not support the suspension from practice; (2) criticism of administration of the Criminal Justice Act and of inequities in assignments under the Act was not cause for discipline or suspension; and (3) even if a letter written by the attorney exhibited an "unlawyer-like rudeness," this single incident of rudeness or lack of professional courtesy was not "contemptuous or contumacious conduct" and would not support a finding that the attorney was unfit to practice in federal courts; nor did it rise to a level of conduct unbecoming a member of the bar. 472 U.S. at 646-67. Because Snyder was under no affirmative obligation to petition for compensation or to accept appointments under the Act, he had violated no professional duty. In contrast, Respondent in this case was under an affirmative obligation to conform his conduct to KRPC 4.4 and KRPC 8.4(d). He had a duty to know and adhere to their requirements.

In *Wunsch*, an attorney was charged with, *inter alia*, interfering with the administration of justice, and displaying an "offensive per-

sonality" when, after his disqualification in a criminal tax prosecution, he sent a sexist letter to an assistant United States attorney criticizing advocacy of that disqualification. The Ninth Circuit Court of Appeals reversed the sanction, holding that (1) the attorney's letter, while "deplorable," did not clearly interfere with the administration of justice because it was a "single incident involving an isolated expression of a privately communicated bias" that was outside the context of and had no adverse effect on any ongoing case; and (2) the California statute requiring all attorneys to "abstain from all offensive personality" was unconstitutionally vague. 84 F.3d at 1117-18. In this case, Respondent's conduct was not private but public and had a direct impact on the KORA request procedure and efficacy. In addition, KRPC 4.4 and KRPC 8.4(d) bear little likeness to the "offensive personality" rule.

In *Finkelstein*, an attorney for civil rights plaintiffs wrote a letter to the general counsel for the defendant, bypassing defendant's trial counsel. The letter contained certain objectionable suggestions for settlement and coercive language. Under its "inherent power," and based on an unwritten, "transcendental" code of ethics, the federal district court suspended the lawyer from practice. 901 F.2d at 1565. The Eleventh Circuit reversed, concluding: there was no recognized standard under which the federal court could impose this discipline; the subjective opinion of the court was the sole basis for the sanction; and the attorney was not on notice that such discipline could arise from his actions. 901 F.2d at 1565. In this case, Respondent was well aware or should have been well aware that a violation of the rules could result in discipline.

Respondent's last constitutional argument is that the statements in his letter qualified as "political" speech entitled to the highest level of constitutional protection. The record offers him no support. According to Respondent's own testimony at the panel hearing, his conduct was designed only to achieve a particular outcome for a unique, private client. It was not designed to effect political change or accomplish any related end. It had zero "political" import, as that term is understood in constitutional jurisprudence. See, *e.g., Buckley v. Valeo*, 424 U.S. 1, 14, 46 L. Ed. 2d 659, 96 S.

Ct. 612 (1976); *Roth v. United States,* 354 U.S. 476, 484, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957).

We conclude that, to the extent the application of KRPC 4.4 and 8.4(d) in this case placed restrictions on Respondent's speech, they were not overbroad and did not violate either the First Amendment § 11 of the Kansas Bill of Rights. A lawyer's right to free speech is tempered by his or her obligation to both the courts and the bar, an obligation ordinary citizens do not undertake. *Nelson,* 210 Kan. at 640; see *Gentile,* 501 U.S. at 1071; *In re Sawyer,* 360 U.S. 622, 3 L. Ed. 2d 1473, 79 S. Ct. 1376 (1959); *State ex rel. Nebraska State Bar Assn. v. Michaelis,* 210 Neb. 545, 556-58, 316 N.W.2d 46 (1982) ("A lawyer belongs to a profession with inherited standards of propriety and honor, which experience has shown necessary in a calling dedicated to the accomplishment of justice . . . . A layman may, perhaps, pursue his theories of free speech or political activities until he runs afoul of the penalties of libel or slander, or into some infraction of our statutory law. A member of the bar can, and will, be stopped at the point where he infringes our Canons of Ethics; and if he wishes to remain a member of the bar he will conduct himself in accordance therewith.").

## KRPC 8.3

The Disciplinary Administrator also challenges the panel's final hearing report in one respect, arguing its dismissal of the claim regarding violation of KRPC 8.3 (2006 Kan. Ct. R. Annot. 509) was error.

KRPC 8.3(a) states: "A lawyer having knowledge of any action, inaction, or conduct which in his or her opinion constitutes misconduct of an attorney under these rules shall inform the appropriate professional authority."

The Disciplinary Administrator argues Respondent violated KRPC 8.3 when he published the February 18 letter—alleging Swenson had engaged in an ethical violation—without simultaneously reporting Swenson to the Disciplinary Administrator. Respondent insists his eventual reporting of Swenson was sufficient compliance with KRPC 8.3, which sets out no time limit. The hearing panel agreed with Respondent's reading of the rule.

We are unwilling to use this case as a vehicle to impose a time limit for reporting lawyer misconduct to the Disciplinary Administrator. Unlike the Respondent in *In re Pyle*, 278 Kan. 230 (*Pyle I*), this Respondent ultimately complied with KRPC 8.3.

We also acknowledge the Disciplinary Administrator's argument that, by threatening disciplinary action to achieve a result desired by his client, Respondent also violated KRPC 8.3. A lawyer may not employ such a threat to obtain a legal advantage for his or her client; we have specifically disapproved of such extortion attempts. We associate them with KRPC 4.4 rather than with KRPC 8.3. We have already ruled that Respondent violated KRPC 4.4 and therefore engage in no further discussion of this point.

*Sanction*

Respondent argues the Disciplinary Administrator's office did not specify the ABA Standards upon which we should rely for the recommended discipline of public censure. He also takes exception to the panel's application of aggravating and mitigating factors.

The record reveals that the Disciplinary Administrator referenced Standard 7.0, and specified Standard 7.3 as the basis for its discipline recommendation. Respondent countered that, if a violation was found, Standard 7.4 on admonition was more appropriate. The panel noted that it had reviewed the ABA Standards and that none fit Respondent's situation precisely.

Neither this court nor the hearing panel is required, in an attorney disciplinary proceeding, to cite and discuss every potentially applicable ABA Standard. The ABA Standards serve only as guidelines to assist courts in selecting appropriate and uniform discipline, depending upon the facts and the aggravating and mitigating factors present in each case. *In re Ware*, 279 Kan. 884, 892-93, 112 P.3d 155 (2005).

We conclude the Disciplinary Administrator's recommended discipline is within the ABA guidelines and is consistent with this court's precedent. *In re Lober*, 276 Kan. 633, 640, 78 P.3d 442 (2003). We therefore adopt the recommendation of public censure as the appropriate discipline under the facts herein.

IT IS THEREFORE ORDERED that C. Richard Comfort be and is hereby censured in accordance with Supreme Court Rule 203(a)(3) (2006 Kan. Ct. R. Annot. 243).

IT IS FURTHER ORDERED that this opinion be published in the Kansas Reports and that the costs of these proceedings be assessed to Respondent.

NUSS, J., not participating.

MARQUARDT, J., assigned.