No. 104,199

In the Matter of MICHAEL A. MILLETT, *Respondent.*

(241 P.3d 35)

Opinion filed October 15, 2010.

*Alexander M. Walczak*, Deputy Disciplinary Administrator, argued the cause, and *Stanton Hazlett*, Disciplinary Administrator, was with him on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and Michael A. Millett, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Michael A. Millett, of Overland Park, an attorney admitted to the practice of law in Kansas in 1997.

On October 26, 2009, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on November 18, 2009. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on December 16, 2009, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 4.3 (2009 Kan. Ct. R. Annot. 572) (dealing with unrepresented person), 8.4(b) (2009 Kan. Ct. R. Annot. 602) (commission of a criminal act reflecting adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), 8.4(c) (engaging in conduct involving misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice). Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"FINDINGS OF FACT

. . . .

"2. Detective Timothy Shavers with the Johnson County Sheriff's Department was assigned to the investigations division. As part of his duties assigned to the

investigations division, Detective Shavers conducted investigations of electronic solicitation.

"3. K.S.A. 21-3523 prohibits electronic solicitation. That statute provides, in pertinent part, as follows:

'(a) Electronic solicitation is, by means of communication conducted through the telephone, internet, or by other electronic means:

(1) Enticing or soliciting a person whom the offender believes to be a child 14 or more years of age but less than 16 years of age to commit or submit to an unlawful sexual act; or

. . . .

'(b) Electronic solicitation as described in subsection (a)(1) is a severity level 3 person felony. . . .

'(c) For the purposes of this section, "communication conducted through the internet or by other electronic means" includes but is not limited to e-mail, chatroom chats and text messaging.'

"4. In order to facilitate his investigations, Detective Shavers developed an online identity, Brandi Holman, a 14 year old female. Detective Shavers included a photograph of a young woman in his online profile.

"5. For some time, Detective Shavers, as 'Brandi Holman,' conversed with Matthew Sewell in an online chat room. During the conversations, Mr. Sewell identified himself by name and, eventually, solicited sex from 'Ms. Holman.' Mr. Sewell requested to meet 'Ms. Holman,' for a sexual encounter. 'Ms. Holman' agreed to meet Mr. Sewell on March 22, 2007, at the Hardee's Restaurant in Olathe, Johnson County, Kansas. Mr. Sewell described his vehicle and told 'Ms. Holman' he would back in his vehicle in a parking spot, so 'Ms. Holman' would be able to identify Mr. Sewell.

"6. After Matthew Sewell arrived at the Hardee's Restaurant on March 22, 2007, detectives from the Johnson County Sheriff's Department arrested Mr. Sewell.

"7. Following the arrest, the detectives conducted an interview of Matthew Sewell. Mr. Sewell told the detectives that he did not know why he was being arrested. Mr. Sewell told the detectives that he was at the Hardee's Restaurant because his brother, John Sewell, [Footnote: John Sewell, a member of the Army National Guard, was stationed in Idaho from December, 2006, to March 25, 2007. In the early morning hours of March 25, 2007, John Sewell was arrested for driving under the influence of alcohol in Idaho. Coincidentally, later, on March 25, 2007, John Sewell was transferred to Pennsylvania for training. John Sewell remained in Pennsylvania until some time in June, 2007. In June, 2007, John Sewell was transferred to Oklahoma.] called him and asked him to meet him at the restaurant. Matthew Sewell further explained that John Sewell owed him $500.00 and John Sewell agreed to repay the debt that day at that location.

"8. The Johnson County District Attorney charged Mr. Sewell with electronic solicitation of a child, in violation of K.S.A. 21-3523(a)(1), a person, level 3 felony, Johnson County District Court case number 07CR0789.

"9. Matthew Sewell retained the Respondent to represent him in the criminal case. Thereafter, on March 29, 2007, the Respondent entered his appearance in behalf of Matthew Sewell in the Johnson County District Court case.

"10. The representation of Matthew Sewell was the first time the Respondent represented a person charged with felony sexual offense. Prior to that time, the Respondent's practice primarily included misdemeanor criminal appointments, care and treatment appointments, divorce cases, and construction law cases.

"11. The Court scheduled Matthew Sewell's trial for August 27, 2007.

"12. In August, 2007, Matthew Sewell spoke with John Sewell by telephone regarding his arrest. Matthew Sewell told John Sewell that he was his only chance. Matthew Sewell told John Sewell that if he would make a statement to the law enforcement officers that he had engaged in the online conversations with 'Brandi Holman' and that he played a practical joke on Matthew Sewell by having him arrive at Hardee's that Matthew Sewell would not be convicted and that John Sewell would not get in any trouble.

"13. John Sewell's and Matthew Sewell's parents were upset by the situation that Matthew Sewell found himself in. John Sewell spoke with his parents regarding the predicament that Matthew Sewell was in.

"14. John Sewell returned to the Kansas City area for a visit at his parents' request. While John Sewell was in the Kansas City area for a visit, he agreed to meet with the Respondent, be interviewed by law enforcement officers, and inform the law enforcement officers that he engaged in the online chat and was playing a practical joke on his brother, Matthew Sewell.

"15. On August 21, 2007, Matthew Sewell drove John Sewell to the Respondent's office for a meeting. [Footnote: The Respondent's testimony and John Sewell's testimony was inconsistent on many issues. The Hearing Panel was in the position to observe the witnesses testify. Both the Respondent and John Sewell have credibility problems. However, the Hearing Panel concludes that the Respondent appears to be more credible. Accordingly, the Hearing Panel has discounted John Sewell's testimony on some issues.] During the meeting, the Respondent provided John Sewell with legal advice by advising him that he could not be charged with a crime because he had not gone to the agreed upon location, the Hardee's Restaurant in Olathe, Kansas.

"16. At the conclusion of the meeting, the Respondent called Tim Keck, an Assistant District Attorney, and stated that John Sewell wanted to make a statement to the police regarding the charges pending against Matthew Sewell. The Respondent told Mr. Keck that the interview of John Sewell was conditioned upon the Respondent sitting in on the interview. Mr. Keck provided John Sewell's contact information to Detective Shavers and Detective Chris Evans. As a result, a detective contacted John Sewell and scheduled an interview for the following day. John Sewell told the detective that he would be appearing with his attorney, the Respondent.

"17. On August 22, 2007, Matthew Sewell drove John Sewell to the Johnson County Sheriff's Department. Matthew Sewell met the Respondent in the parking

lot. The Respondent accompanied Matthew Sewell to the interview room. John Sewell believed that the Respondent was accompanying him to the interview because he was representing him.

"18. Detectives Shavers and Evans were present in the interview room with John Sewell and the Respondent. Because of a previous failure with the interview room's audio/video recording system, the detectives placed a portable audio recording device on the table. The detectives turned on the portable recorder and began recording the interview. Additionally, the interview room's audio/video recording system was also initiated and recording the interview.

"19. While the detectives did not specifically state that they were recording the interview, the portable audio recording device was placed on the table in front of the Respondent and John Sewell and the interview was taking place in an interview room which was equipped with an audio/video recording system.

"20. At the outset of the interview, the detectives explained to John Sewell that he was not in custody and could stop the interview at any time. The detectives explained that no matter what he said, he would not be arrested that day. Despite the fact that he was not in custody, the detectives also informed John Sewell of his rights pursuant to *Miranda v. Arizona* [,384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)]. John Sewell agreed to waive his rights and answer the detectives' questions.

"21. The Respondent stated that he was not appearing as John Sewell's attorney, but rather as Matthew Sewell's attorney. The detectives told the Respondent that he would not be able to remain in the interview if he was not John Sewell's attorney. The Respondent told the detectives that if a question arose during the interview that he would answer the question as an attorney. The Respondent informed the detectives that the interview of John Sewell was conditioned upon the Respondent being allowed to be present during the interview.

"22. The detectives left the room to discuss the situation with their supervisors. While the detectives were not present in the room, the Respondent again told John Sewell that he was not representing him. The Respondent told John Sewell:

'But as I told you if you had questions or if there was anything . . . you know I could answer questions for you . . . if I thought there was gonna be an issue . . . if I thought they were trying to take you down some road, I was gonna let you know.'

"23. The Respondent noticed that the portable audio recording device was recording his conversation with John Sewell. The Respondent picked up the portable recording device, turned it off, rewound the tape, and set the portable recording device back on the table. The Respondent picked up the portable recording device a second time and, again, placed it back on the table. The Respondent picked up the portable recording device a third time, rewound the tape again, set the portable recording device back on the table, and recorded over some portion of the previous conversation.

"24. From an observation room, one of the detectives observed the Respondent when he repeatedly picked up the portable audio recording device.

"25. The detectives returned to the room, allowed the Respondent to remain in the interview room, and began asking John Sewell substantive questions regarding the online chat.

"26. After questioning John Sewell regarding the online chat, the detectives confronted him with information regarding his arrest in Idaho on March 25, 2007. At that time, John Sewell declined to answer any more questions and attempted to terminate the interview. The Respondent encouraged John Sewell to continue to answer questions posed by the detectives on several occasions after John Sewell indicated that he wished to terminate the interview. The Respondent repeatedly told John Sewell to remember why he was there. John Sewell agreed to answer questions that did not relate to Idaho. The Respondent attempted to mediate the interview between John Sewell and the detectives. The Respondent stated that John Sewell could not be charged with a crime because he did not travel to the agreed upon location. The Respondent also debated with the detectives regarding the elements of the crime. The detectives did not question John Sewell further.

"27. The Respondent briefly met with John Sewell following the interview by the detectives.

"28. The next day, August 23, 2007, John Sewell contacted Detectives Shavers and Evans. John Sewell asked to meet with the detectives without the Respondent. John Sewell and the detectives met in the detective's car. At that time, John Sewell told the detectives that he did not participate in the online chats and that he had lied the previous day. John Sewell was concerned that he would be charged with a crime that he did not commit. John Sewell was also concerned that he might not get to be deployed to Kuwait as planned.

"29. On August 24, 2007, the Johnson County District Attorney charged John Sewell with obstruction of official duty, in violation of K.S.A. 21-3808(b)(1), a nonperson, level 9 felony.

"30. John Sewell retained Patrick Flannigan to represent him in the pending criminal case. John Sewell agreed to cooperate with the Sheriff's department.

"31. On September 5, 2007, John Sewell, along with his attorney Patrick Flannigan, met with the detectives. At that time, John Sewell provided a more detailed statement.

"32. On September 6, 2007, Detectives Shavers and Evans met with the Respondent. The detectives questioned the Respondent about how the recording on the portable audio recording device had been tampered with. Initially, the Respondent told the detectives that John Sewell stopped the recorder and taped over the previously recorded statements.

"33. The detectives informed the Respondent that in addition to the portable audio recording device, the interview room was equipped with an audio/video recording system and that they had a video which established that the Respondent had stopped the tape and recorded over the statements.

"34. After being confronted with the existence of a videotape recording, the Respondent admitted that he stopped the tape of the portable audio recording device, rewound the tape, and recorded over statements.

"35. On December 10, 2007, the Johnson County District Attorney charged the Respondent with obstruction of official duty, in violation of K.S.A. 21-3808(b)(1), a nonperson, level 9 felony.

"36. John Sewell testified in the criminal cases against Matthew Sewell and the Respondent. In exchange for his cooperation, on December 8, 2008, the Johnson County District Attorney dismissed the pending charge of felony obstruction against John Sewell.

"37. Following a preliminary hearing, the Court bound the Respondent over for trial. Thereafter, on April 3, 2009, the Respondent entered into a plea agreement. The Respondent entered a plea of guilty to attempted obstruction of official duty, in violation of K.S.A. 21-3808(b)(2), a class B misdmeanor.

"38. At the plea hearing, the prosecutor provided a factual statement to support the conviction, as follows:

'MR. STEIN: . . . Judge, the State would present evidence and testimony that on August 22nd, 2007, here in Johnson County, Kansas, the defendant, Michael Millett, accompanied an individual by the name of John Sewell to the Johnson County Sheriff's Office investigations building.

'John Sewell is the brother of Mathew [sic] Sewell who at the time on August 22nd, 2007, was a client of Michael Millett.

'Judge, Detectives Shavers and Evans with the Johnson County Sheriff's Department were investigating a crime allegedly committed by Matthew Sewell, the client of Michael Millett.

'During the interview of John Sewell, which is the purpose for Michael Millett and John Sewell being in the investigations building, detectives temporarily leave [sic] the interview room.

'Michael Millett stopped the audio recording being taken by the Detective, rewound the recording, thereby, deleting some of the conversation that had been recorded by Detectives.

'Mr. Millett stopped the tape, which in turn there was no recording of the conversation that he had with John Sewell.

'Although Mr. Millett attempted to substantially increase the burden on the Detectives and their collection of witness' statements during the investigation of the crime, Mr. Millett failed in his attempt because there was an additional audio and videotape recording which captured the entire interview in that investigation room on August 22, 2007.

'THE COURT: Well, do you agree with the factual statement that has been articulated by Mr. Stein?

'THE DEFENDANT: Yes, Your Honor.

'THE COURT: This is a Class B misdemeanor with a maximum punishment of six months in the county jail; do you understand that?

'THE DEFENDANT: Yes, Your Honor.

'THE COURT: Do you understand the length of your sentence, whether you receive probation, as well as the terms and conditions of probation, will be up to the Court's discretion?

'THE DEFENDANT: Yes, Your Honor.'

"39. During sentencing, the Respondent stated:

'. . . I did, however, rewind a tape. I don't know why I did it, but I did it.

. . . .

'I know I made some mistakes, Your Honor. Now, I'm looking at this, I had a conflict of interest. I know I should have made sure that John Sewell had another attorney.

'I know I should have never put myself in a position to be answering these questions or giving him legal advice, and I know that I should have never touched that tape.

'I take being a lawyer and being honest seriously. I in no way meant to bring any type of dishonor or disgrace to the legal professions by my actions.'

"The Court sentenced the Respondent to a jail sentence, but placed the Respondent on probation. On October 1, 2009, the Respondent successfully completed the probation and was discharged from any further obligation with regard to the criminal case.

"40. On October 26, 2009, the Deputy Disciplinary Administrator filed a Formal Complaint. The Respondent answered and admitted that he violated certain rules of professional conduct. However, the Respondent did not specifically state which rules that he had violated.

### "CONCLUSIONS OF LAW

"1. In the Formal Complaint, the Deputy Disciplinary Administrator alleged that the Respondent violated KRPC 8.4(b), KRPC 8.4(c), KRPC 8.4(d), and KRPC 8.4(g). [Footnote: The Hearing Panel concludes that KRPC 8.4(g) is a catch-all provision that does not apply in this case because the Respondent's misconduct amounts to violations of more specific rules.] During the Respondent's criminal proceedings and during the hearing on the Formal Complaint, the Respondent admitted that he engaged in a 'conflict of interest' when he provided advice to John Sewell and when he failed to ensure that John Sewell had separate legal counsel.

"2. Generally, the 'conflict of interest' rules are found at KRPC 1.7, KRPC 1.8, KRPC 1.9, and KRPC 1.10. The Hearing Panel has reviewed those rules and has found that they do not apply in this situation. However, the Hearing Panel has also reviewed KRPC 4.3. In the Hearing Panel's view, KRPC 4.3 is the only additional violation that may apply in this case.

"3. It is appropriate to consider violations not specifically included in the Formal Complaint under certain circumstances. The law in this regard was thoroughly examined in *State v. Caenen*, 235 Kan. 451, 681 P.2d 639 (1984), as follows:

'Supreme Court Rule 211(b) (232 Kan. clxvi), requires the formal complaint in a disciplinary proceeding to be sufficiently clear and specific to inform the respondent of the alleged misconduct.

'The seminal decision regarding the applicability of the due process clause to lawyer disciplinary proceedings is found in *In re Ruffalo*, [390 U.S. 544, 20

L. Ed. 2d 117, 88 S. Ct. 1222, *reh. denied* 391 U.S. 961 (1968)]. There the United States Supreme Court held that a lawyer charged with misconduct in lawyer disciplinary proceedings is entitled to procedural due process, and that due process includes fair notice of the charges sufficient to inform and provide a meaningful opportunity for explanation and defense.

'Decisions subsequent to *Ruffalo* have refined the concept of due process as it applies to lawyer disciplinary hearings, and suggest that the notice to be provided be more in the nature of that provided in civil cases. The weight of authority appears to be that, unlike due process provided in criminal actions, there are no stringent or technical requirements in setting forth allegations or descriptions of alleged offenses. . . . Due process requires only that the charges must be sufficiently clear and specific to inform the attorney of the misconduct charged, but the state is not required to plead specific rules, since it is the factual allegations against which the attorney must defend. . . . However, if specific rules are pled, the state is thereafter limited to such specific offenses. . . .

'Subsequent to the *Ruffalo* decision, the due process requirements in lawyer disciplinary proceedings have been given exhaustive treatment by this court. In *State v. Turner,* 217 Kan. 574, 538 P.2d 966 (1975), 87 A.L.R.3d 337, the court summarized prior Kansas and federal precedent on the question, including *Ruffalo,* and held in accordance with established precedent that the state need not set forth in its complaint the specific disciplinary rules allegedly violated . . . , nor is it required to plead specific allegations of misconduct. . . . What is required was simply stated therein:

"We must conclude that where the facts in connection with the charge are clearly set out in the complaint a respondent is put on notice as to what ethical violations may arise therefrom. . . .

. . . .

"It is not incumbent on the board to notify the respondent of charges of specific acts of misconduct as long as proper notice is given of the basic factual situation out of which the charges might result." '

235 Kan. at 458-59 (citations omitted). Thus, only when the Formal Complaint alleges facts that would support findings of violations of additional rules, will considering additional violations be allowed. In this case, the Formal Complaint includes the following language:

'5. . . . The Respondent advised John Sewell that he could not get into trouble if he told the investigators that he, and not his brother Matthew, engaged in the electronic solicitation as a practical joke against his brother because he was never at the crime scene.

'6. John Sewell believed that the Respondent was acting as his attorney by giving him legal advice and by accompanying him to the law enforcement interview on August 22, 2007.

'7. . . . John Sewell advised the detective that he and his attorney, the Respondent, would meet him at the Sheriff's Office. Later that day, the Respondent and John Sewell met detectives Shavers and Chris Evans for the interview.

. . . .

'9. . . . The Respondent told Detective Shavers that he was the attorney for Matthew Sewell, and not John Sewell, and he was present only to represent Matthew. . . .

'10. The Respondent advised Detective Shavers that he was present in a legal capacity for Matthew Sewell and had informed John Sewell that if he had questions during the interview, he would answer them as an attorney. . . .

'11. While the Respondent and John Sewell were alone in the interview room, the Respondent told John Sewell "But as I told you if you had questions or if there was anything . . . you know I could answer questions for you . . . if I thought there was gonna be an issue . . . if I thought they were trying to take you down some road, I was gonna let you know. . . ." '

The Hearing Panel concludes that the Formal Complaint contains sufficient facts to support a finding that the Respondent violated KRPC 4.3. Thus, in the opinion of the Hearing Panel, the additional violation of KRPC 4.3 should be considered.

"4. KRPC 4.3 provides:

'In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.'

Clearly John Sewell misunderstood the Respondent's role in this matter. The Respondent knew or should have known of John Sewell's misunderstanding based upon the circumstances. The Respondent did not make reasonable efforts to correct the misunderstanding until it was too late. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 4.3.

"5. 'It is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.' KRPC 8.4(b). In this case, the Respondent entered a plea of guilty to attempted obstruction of an official duty, a class B misdemeanor. A conviction for attempting to obstruct a police officer's official duty reflects adversely on the Respondent's honesty, trustworthiness, and fitness as a lawyer in other respects. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(b).

"6. 'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent engaged in conduct that involved dishonesty when he falsely stated to the detectives that he did not rewind the tape, but rather, that John Sewell had rewound the tape and taped over the conversation. Because the Respondent made a false statement to the detectives, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

"7. 'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). In this case, the Respondent engaged in 'conduct that is prejudicial to the administration of justice'

when he rewound the tape, when he falsely stated to the police officers that John Sewell had rewound the tape, and when he provided John Sewell legal advice when his interests were in conflict with Matthew Sewell's interests. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).

## "AMERICAN BAR ASSOCIATION
## STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to the legal profession and to the public to maintain his personal integrity.

"*Mental State.* The Respondent knowingly violated his duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual injury to the legal profession and the legal system.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"*Dishonest or Selfish Motive.* The Respondent engaged in dishonest conduct when he provided a false statement to the police officers that John Sewell had rewound the tape and taped over the conversation.

"*Substantial Experience in the Practice of Law.* The Respondent has substantial experience in the practice of law as he was admitted to practice in 1997.

"*Illegal Conduct.* The Respondent entered a plea of guilty to attempted obstruction of official duty.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"*Absence of a Prior Disciplinary Record.* The Respondent has not previously been disciplined.

"*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* Based upon a number of letters received by the Hearing Panel, the Respondent enjoys a good reputation among his peers in the Johnson County bar.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

'7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

## "RECOMMENDATION

"The Deputy Disciplinary Administrator made two separate recommendations. First, if the Hearing Panel were to find that the Respondent conspired with Matthew Sewell and John Sewell or knew or encouraged John Sewell to provide false information to the police officers, then the Deputy Disciplinary Administrator recommended that the Respondent be disbarred. On the other hand, if the Hearing Panel concludes that the Respondent did not engage in the fraud, but rather, only the remaining misconduct, then the Respondent recommended that the Respondent be indefinitely suspended from the practice of law.

"The Respondent argued that the misconduct warranted censure and that the censure be published in the Kansas Reports.

"Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be suspended from the practice of law for 30 days. The Hearing Panel further recommends that the Respondent not be required to undergo a reinstatement hearing pursuant to Kan. Sup. Ct. R. 219.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009); see Supreme Court Rule 211(f) (2009 Kan. Ct. R. Annot. 321). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " 288 Kan. at 505 (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]). The evidence before the hearing panel establishes the charged miscon-

duct of the respondent by clear and convincing evidence and supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The panel recommends that the respondent be suspended from the practice of law for 30 days, after which he should be reinstated without a hearing pursuant to Supreme Court Rule 219 (2009 Kan. Ct. R. Annot. 376). The Disciplinary Administrator's office argued for an indefinite suspension. "The recommendation of the panel or the Disciplinary Administrator as to sanctions to be imposed shall be advisory only and shall not prevent the Court from imposing sanctions greater or lesser than those recommended by the panel or the Disciplinary Administrator." Supreme Court Rule 212(f) (2009 Kan. Ct. R. Annot. 338).

The respondent's lack of any prior disciplinary record and his good reputation among his peers in the Johnson County bar convince us that an indefinite suspension is not the appropriate sanction. On the other hand, the respondent's intentional and dishonest conduct, especially the deceitful act of implicating another for the crime that he had committed, cannot be condoned, even if an isolated incident. Accordingly, we believe the appropriate sanction in this case is a 2-year suspension from the practice of law, to commence upon the filing of this opinion.

IT IS THEREFORE ORDERED that MICHAEL A. MILLETT be suspended from the practice of law in the state of Kansas for a period of 2 years, effective this date, in accordance with Supreme Court Rule 203(a)(2) (2009 Kan. Ct. R. Annot. 272).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2009 Kan. Ct. R. Annot. 361), and in the event the respondent would seek reinstatement, he shall comply with Supreme Court Rule 219.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

PATRICIA MACKE DICK, District Judge, assigned.