No. 58,809

In the Matter of DARREL E. JOHNSON, *Respondent.*

(729 P.2d 1175)

Opinion filed December 5, 1986.

*Stanton A. Hazlett,* disciplinary counsel, appeared and argued for the disciplinary administrator.

*Jack Focht,* of Focht, Hughey and Hund, of Wichita, argued the cause and was on the brief for respondent.

*Per Curiam:* Arno Windscheffel, disciplinary administrator, filed a complaint with the Board for Discipline of Attorneys (Board) against Darrel E. Johnson, an attorney admitted to the practice of law in Kansas. The complaint concerned a campaign letter Johnson distributed during the 1984 Morton County Attorney primary election. The Board found violations of DR 1-102(A)(4), (5), and (6) (235 Kan. cxxxvii) and recommended that Johnson be publicly censured.

Johnson is the current Morton County Attorney. In the August 1984 primary election, Johnson ran for reelection as county attorney on the Republican ticket. The office requires that the candidate must be licensed to practice law in Kansas. Johnson was opposed in the Republican primary by William J. Graybill, a practicing attorney in Elkhart, Kansas.

Late in the campaign, Johnson sent a letter to the majority of registered Morton County Republicans. The letter stated:

"I have tried to visit each Republican in Morton County, over the past few weeks, to personally ask for your vote and support in the upcoming primary election. Several were not at home, so I am taking this opportunity to let you know why I want to continue to serve as your County Attorney.

"I want to be your county attorney because I continue to be alarmed by the worsening blight of illegal drug usage in our community. My opponent has long advocated legalizing marijuana and the other "recreational" drugs (cocaine, etc.). And, as City Attorney for Elkhart, he recommended the repeal of the City's DUI (Driving Under the Influence) law. I am extremely concerned that a prosecutor with this philosophy, would simply ignore the drug crimes and thereby allow the growth of illegal drug usage, wasting the great potential of the young who would become involved. I pledge to intensify the effort to remove illegal drugs from our community. For the sake of our children, we must try.

"I am also extremely concerned about the correction of juvenile offenders and the care of neglected or abused children. In my term, we have treated 16 juveniles in State facilities provided for them. We currently have no other means

by which to treat the repeat offenders or to care for those abused or neglected. (The different needs are treated in separate, specialized facilities). But, my opponent has continually voiced his opposition to the State's involvement in juvenile correction and care. He would rather let juvenile offenders run the streets, and allow abused, neglected children to remain in their misery. Can our children afford a prosecutor with this attitude?

"I am also concerned about the fact that my opponent, as City Attorney and therefore legal advisor to the police, has instructed the police not to "bother" him after 5:00 p.m. or on weekends. Those are the exact times officers most often work criminal cases. To expect them to work without legal advice puts an enormously unfair burden upon them, and certainly could result in offenders not being prosecuted. I will continue to be available to law enforcement officers on a 24 hour-a-day basis.

"I am asking you to please join me in protecting our community. YOUR VOTE COULD MAKE THE DIFFERENCE.

"Thank you for taking time to read this letter. Your vote and continued support will be appreciated."

The letter criticized Graybill's stand on drugs, juvenile correction and care, and driving under the influence laws, and his accessibility as legal advisor to the local police. The Board found by clear and convincing evidence that Johnson had "circulated a letter with damaging statements about Mr. Graybill that were false and he knew they were false." The Board recommended that Johnson be publicly censured for violation of Disciplinary Rule 1-102(A)(4), (5), and (6).

Johnson took exception to the Board's report, contending that:

1. His statements are constitutionally protected under the First Amendment to the United States Constitution;

2. his conduct did not reflect on his ability to represent clients honestly;

3. his conduct was not prejudicial to the administration of justice; and

4. his conduct was accompanied by mitigating factors.

Disciplinary Rule 1-102 provides in part:

(A) A lawyer shall not:

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

## 1. First Amendment Rights

Under the Disciplinary Rules, a lawyer's First Amendment rights are limited. DR 8-102(B) (235 Kan. clii) specifically pro-

hibits a lawyer from knowingly making a false accusation against a judge or other adjudicatory officer. The reason appears in Ethical Consideration 8-6, which provides in part: "Adjudicatory officials, not being wholly free to defend themselves, are entitled to receive the support of the bar against unjust criticism." ABA/BNA Lawyers' Manual on Professional Conduct, 01:345 (1984).

A lawyer, as a citizen, has a right to criticize a judge or other adjudicatory officer publicly. To exercise this right, the lawyer must be certain of the merit of the complaint, use appropriate language, and avoid petty criticisms. Unrestrained and intemperate statements against a judge or adjudicatory officer lessen public confidence in our legal system. Criticisms motivated by reasons other than a desire to improve the legal system are not justified.

Johnson admits that the state has a legitimate interest in regulating the attorney's right to criticize judges and adjudicatory officers. Johnson argues that, while attorneys may be specifically prohibited from knowingly making false statements about judicial candidates, the state has no authority, under the guise of professional responsibility, to control speech relating to candidates for other offices.

The First Amendment to the United States Constitution states that the Congress shall make no law abridging the freedom of speech. Section 11 of the Kansas Constitution Bill of Rights states each person may freely speak, write, or publish their sentiment on all subjects, "being responsible for the abuse of such rights." Both the United State Supreme Court and this court have recognized that freedom of speech and press is not without certain limitations.

One who has received a license and is accorded the privilege to practice law is still guaranteed the right of freedom of speech. In those instances where a lawyer's unbridled speech amounts to misconduct which threatens a significant state interest, a state may restrict the lawyer's exercise of personal rights guaranteed by the Constitutions. *N.A.A.C.P. v. Button*, 415 U.S. 415, 438, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963).

Other jurisdictions have recognized that, unlike a layman, a bar member's right to free speech may be regulated. In *State ex rel. Nebraska State Bar Assn. v. Michaelis*, 210 Neb. 545, 316

N.W.2d 46 (1982), an attorney had placed a newspaper adver-
tisement which listed several factual charges of misconduct,
illegal acts, and other violations of the law, which he knew or
should have known to be false, by the then incumbent county
attorney, the city attorney, and several other attorneys practicing
in the region. The court stated that "[a] lawyer belongs to a
profession with inherited standards of propriety and honor,
which experience has shown necessary in a calling dedicated to
the accomplishment of justice. . . . 'A layman may, perhaps,
pursue his theories of free speech or political activities until he
runs afoul of the penalties of libel or slander, or into some
infraction of our statutory law. *A member of the bar can, and
will, be stopped at the point where he infringes our Canons of
Ethics;* and if he wishes to remain a member of the bar he will
conduct himself in accordance therewith.' " 210 Neb. at 556-58.

Upon admission to the bar of this state, attorneys assume
certain duties as officers of the court. Among the duties imposed
upon attorneys is the duty to maintain the respect due to the
courts of justice and to judicial officers. A lawyer is bound by the
Code of Professional Responsibility in every capacity in which
the lawyer acts, whether he is acting as an attorney or not, and is
subject to discipline even when involved in nonlegal matters,
including campaigns for nonjudicial public office. *State v. Rus-
sell,* 227 Kan. 897, 610 P.2d 1122 *cert. denied* 449 U.S. 983
(1980). The imposition of the ethical obligation of honesty upon
lawyers under DR 1-102(A)(4) is necessary for the administration
of justice. See cases cited in *State v. Russell,* 227 Kan. at 900-901.
Disciplinary action can be exercised not only for the purpose of
enforcing legal rights but for the additional purpose of enforcing
honorable conduct on the part of the court's own officers. In *In re
Estate of Williams,* 160 Kan. 220, 160 P.2d 260 (1945).

Under our system, the county attorney is the highest law
officer of the county. The county attorney, as much as any
judicial officer, is directly involved in the legal process. To
provide for the protection of the administration of justice, this
court has the inherent power to discipline a candidate for the
office of county attorney whenever the candidate's activities are
contrary to the just and orderly administration of law.

Johnson next contends that the State did not prove by clear and
convincing evidence that the disciplinary rules were violated.

The role of the Board is similar to that of a commissioner appointed by the court to conduct hearings and to make a report of his findings, conclusions, and recommendations. Although such a report is advisory only, it will be given the same dignity as a special verdict by a jury, or the findings of a trial court, and will be adopted where amply sustained by the evidence, or where it is not against the clear weight of the evidence. *State v. Zeigler,* 217 Kan. 748, 755, 538 P.2d 643 (1975).

The first disputed portion of Johnson's campaign letter concerns Graybill's prior statements on the legalization of drugs. Graybill denied that he had ever made the statements Johnson alleged. Johnson testified that he based these statements upon a number of conversations he had had with Graybill over the nine years they were in practice. Johnson admitted that in their conversations Graybill had discussed "decriminalizing the penalty" rather than legalizing the use of drugs. We recognize that there is a vast difference between decriminalizing drug use penalties and legalizing the use of drugs. While a voter may not realize the distinction, Johnson, as county attorney, must have realized the difference and known what effect it would have on the voters when he published his statement. We agree with the Board's findings.

The Board found that those portions of Johnson's letter dealing with the city DUI ordinance were "totally false." The evidence presented showed that Graybill recommended repeal of the city DUI ordinance because the Kansas Legislature passed a law which invalidated the existing Elkhart city ordinance. Johnson's statement regarding the DUI ordinance was designed to be a half-truth. Johnson stated Graybill's recommendation to repeal the DUI ordinance but failed to give the legal reason for that recommendation. Johnson implied that Graybill, rather than just interpreting the law, had a different purpose when he recommended repeal.

The Board found that part of Johnson's letter dealing with juvenile correction and care a "lie." The evidence presented by Johnson merely established that Graybill took positions contrary to that of the State and SRS. He could produce no evidence that Graybill "would rather let juvenile offenders run the streets, and all abused, neglected children to remain in their misery."

The statements Johnson made in the letter concerning Gray-

bill's accessibility to city police officers after hours involved conflicting testimony. The Elkhart Chief of Police testified that he had never heard Graybill tell police officers not to call him after hours, and that Graybill had always been accessible when police officers needed him. Other witnesses did testify that Graybill had told them that his office hours were nine to five and officers were not to call him after hours.

There is substantial competent evidence to support the Board's findings that Johnson knew that certain statements he made in his campaign letter were false.

## 2. Good Faith

Johnson contends that he should not be found in violation of the disciplinary code because the statements he made in the campaign letter were statements of opinion that were made in good faith. He argues that the good faith standards used in libel cases should be applied in disciplinary proceedings.

Johnson cites Justice Prager's dissent to *State v. Russell,* 227 Kan. at 910, that any comment concerning a political candidate's qualifications, "however injurious, is privileged so long as the comment is made in good faith." Good faith "encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage." Black's Law Dictionary 623 (5th ed. 1979). Unlike Johnson, Russell was a candidate for an office that did not require, as a qualification, a license to practice law. *Russell* is not persuasive.

Johnson argues that when an attorney is acting outside of his professional capacity in the exercise of his constitutional right to free speech and the offending conduct could not reasonably affect his representation of clients or interfere with the administration of justice, there is no basis for professional discipline. We disagree. Lawyers are subject to discipline for improper conduct in business activities, individual or personal activities, and activities as a judicial, governmental, or public official. Improper conduct in any activity can affect an attorney's professional capacity.

Johnson's "good faith" claim is a reiteration of his right to free speech claim. Johnson's statements were not made in good faith. They were calculated to influence the voters against the opposing county attorney candidate.

A similar argument that the good faith standard used in libel should be applied in disciplinary cases was made in *State v. Nelson,* 210 Kan. 637, 640, 504 P.2d 211 (1972). There Nelson, an attorney, had taken exception to the recommendation of the State Board of Law Examiners that Nelson be suspended from the practice of law for five counts of misconduct. This court found that Nelson had violated two counts and Nelson was publicly censured by the court. *State v. Nelson,* 206 Kan. 154, 476 P.2d 240 (1970). After that decision was handed down, a newspaper reporter contacted Nelson, who made certain statements to the reporter. The reported statements in the newspaper were general in nature and broadly directed at all law enforcement and judicial institutions. This resulted in a second disciplinary proceeding being brought against Nelson. Nelson claimed that if his statements were libelous in nature, they must be measured by standards prescribed in *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). If his statements were not libelous within the "actual malice" rule stated in the *New York Times* case, then they were not sufficient to subject him to discipline.

The court found Nelson's argument untenable for two reasons. First, the *New York Times* case and the supporting line of cases were clearly inapplicable to a disciplinary proceeding because those cases were defamatory actions dealing with the constitutional privilege afforded the press. Nelson, an individual, had no such constitutional right. *Beauharnais v. Illinois,* 343 U.S. 250, 96 L. Ed. 919, 72 S. Ct. 725 (1952). Second, it is widely recognized that neither civil nor criminal liability is necessary to maintain an action in a disciplinary proceeding.

Other courts have also found that disciplinary cases are not to be treated as other types of libel cases. For example, in *Leimer v. Hulse,* 352 Mo. 451, 178 S.W.2d 335 (1944), the court rejected the attempted defense that the statements complained of were privileged, on the ground that the material issues in a disbarment proceeding are the falsity of the statements and the intent with which they are made, regardless of the question of privilege.

We believe the reasoning in *Nelson* is sound. The *New York Times* standard of "actual malice" in a civil action for libel is not appropriate in a proceeding to discipline an attorney. Here, the Board found that the respondent knowingly made false state-

ments to enhance his chance of winning the election for county attorney. The evidence supports these findings. Johnson is subject to disciplinary action for his false statements.

### 3. Prejudice to the Administration of Justice

Johnson argues that the application of DR 1-102(A)(5) is inappropriate. He contends that that disciplinary rule applies to an attorney in his capacity as an ordinary citizen and, therefore, the standard for invoking the rule's sanction should be that of "serious and imminent threat" to the fairness and integrity of the judicial system.

Johnson cites *In re Hinds,* 90 N.J. 604, 449 A.2d 483 (1982), for the proposition that a higher standard is required to find a violation of DR 1-101(A)(5). In *Hinds,* disciplinary proceedings were brought against an attorney for making out-of-court statements publicly criticizing a trial judge's conduct of an ongoing criminal trial. The court determined that DR 1-102(A)(5) did not apply when an attorney was not particularly or specially connected with or involved in a criminal case. Under those circumstances, an attorney would enjoy the same free speech rights as any other citizen. The rule's sanctions could not be invoked against such speech unless it was a "clear and present danger" or a "serious and imminent threat" to the fairness and integrity of the judicial system. The court limited its decision to criminal cases only. It declined to find that Hinds had violated the rule because no hearing was conducted and there was no record sufficient to apply DR 1-102(A)(5).

Cases from other jurisdictions which have considered the application of DR 1-102(A)(5) include:

*Matter of Keiler,* 380 A.2d 119 (D.C. 1977). In *Keiler,* the respondent, an associate in a Washington law firm, worked exclusively on labor-management matters. The employees of a Florida company had agreed to submit an issue to arbitration. The respondent asked a labor law partner to act as arbitrator in the proceeding, but did not inform the union that a member of the firm representing the employer was acting as the arbitrator. Following the proceedings, the arbitrator issued a ruling accepting the contentions of the employer. The court, finding a violation of DR 1-102(A)(5), stated that it was no defense to say that no harm was done. It said that a member of the bar, in his professional capacity, should never attempt to deceive another

person. "The crux of the American system of justice is basic fairness." 380 A.2d at 125.

*State Bar v. Semaan,* 508 S.W.2d 429 (Tex. Civ. App. 1974). The respondent had written a letter to a newspaper in which he criticized a judge's qualifications for office. The court said that isolated incidents of criticism of fellow attorneys did not constitute professional misconduct unless the statement was made with knowledge that it was false or with reckless disregard of whether it was false, and such protection against civil or criminal liability extended on the same terms to lawyers as to private citizens, at least for utterances made outside the course of judicial proceedings.

*Matter of Howe,* 257 N.W.2d 420 (N.D. 1977). The respondent deliberately made false statements and failed to disclose in an application for admission to the bar material facts requested in connection with the application. The court found that the deliberate failure to disclose the requested information and the deliberate misinformation constituted conduct prejudicial to the administration of justice and conduct adversely reflecting unfitness to practice law.

All of the above cases have recognized that DR 1-102(A)(5) is violated when an attorney makes a false statement which, in any way, has a bearing on the legal process.

There is no Kansas case which discusses when the application of DR 1-102(A)(5) is appropriate. In *Nelson,* the court found that the respondent had not violated DR 1-102(A)(5). There, Nelson, after learning that a disciplinary board had ordered that he be disciplined, made certain statements which were reported in a newspaper article. Since Nelson's disciplinary case was terminated, any statements made by Nelson could not serve as harassment or intimidation for the purpose of influencing a decision in that case. Therefore, the facts did not establish a violation of DR 1-102(A)(5).

Here, Johnson was not attempting to influence a case, but he was attempting to influence the results of an election. The election had not been terminated at the time the statements were published. The election involved the office of county attorney, an office which could only be held by an individual licensed to practice law. The making of false statements about a candidate for county attorney is prejudicial to the administration of justice.

Johnson's false statements concerning Graybill certainly had an effect on that office and were prejudicial to the administration of justice. Johnson violated DR 1-102(A)(5).

### 4. Mitigation

Johnson contends that, even if the statements he made were false, the court should consider mitigating factors in determining what, if any, punishment should be imposed. The mitigating factors he offers are the lack of prior disciplinary violations, his good character and reputation in the community, and his willingness to cooperate during the disciplinary hearing.

Other courts, however, have imposed similar and sometimes harsher discipline for similar offenses. For example:

In *Matter of Humphrey,* 174 Cal. 290, 163 Pac. 60 (1917), an attorney was suspended from the practice of law for two years for a willful false charge against a superior court judge running for reelection.

In *State Board of Exam. v. Spriggs,* 61 Wyo. 70, 155 P.2d 285 (1945), an attorney, during his unsuccessful campaign for nomination to a judicial office, circulated a pamphlet that contained false statements, innuendos, and implications defamatory of and derogatory to the office. He was suspended for six months.

In *Florida Bar v. Stokes,* 186 So. 2d 499 (Fla. 1966), an attorney, who had been swayed by strong feelings generated in a political atmosphere, made various unspecified disparaging and unfair remarks on a radio program about a local judge who was not a participant on the program and had no opportunity to refute the charges. The attorney was publicly reprimanded.

In *In re Gorsuch,* 76 S.D. 191, 75 N.W.2d 644 (1956), the court reprimanded an attorney for unsubstantiated campaign criticism of an opponent in a judicial primary election.

Johnson's statements in his letter to the Republican voters were made to influence the vote against Graybill in the primary contest. The published statements were available to all who received the publication. Graybill felt required to answer Johnson's statements to protect his reputation to practice law in the local community. Under the circumstances, public censure is required.

The Court, having considered the record herein, concurs in the findings, conclusions, and recommendations of the Board.

IT IS THEREFORE BY THE COURT ORDERED that Dar-

rel E. Johnson be and he is hereby disciplined by public censure and the costs of this proceeding are assessed to the respondent.

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports.

By order of the Court this 5th day of December, 1986.