No. 110,111

In the Matter of ROBERT A. MINTZ, *Respondent.*

(317 P.3d 756)

Opinion filed February 7, 2014.

*Kimberly L. Knoll,* Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett,* Disciplinary Administrator, was with her on the brief for petitioner.

*John J. Ambrosio,* of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause and was on the brief for respondent, and *Robert A. Mintz,* respondent, argued the cause pro se.

*Per Curiam:* In this contested original attorney discipline proceeding, a panel of the Kansas Board for Discipline of Attorneys made findings of fact and concluded Robert A. Mintz did not violate the Kansas Rules of Professional Conduct (KRPC). Before us, the office of the Disciplinary Administrator argues that some of the panel's findings of fact are not supported by clear and convincing evidence and the panel's conclusions of law are not supported. We agree and conclude Mintz violated two rules— KRPC 8.4(c) (2013 Kan. Ct. R. Annot. 655) (conduct involving dishonesty, fraud, deceit, or misrepresentation) and KRPC 8.4(d) (conduct that is prejudicial to the administration of justice). Having found violations of the KRPC, we next consider the discipline warranted by the violations. In doing so, we reject the recommendation of the Disciplinary Administrator that Mintz should be disbarred and conclude that indefinite suspension is appropriate.

## PROCEDURAL BACKGROUND

On February 14, 2013, the office of the Disciplinary Administrator filed a formal complaint against the respondent, alleging violations of three subsections of KRPC 8.4 (2013 Kan. Ct. R. Annot. 655), which make it professional misconduct for an attorney to "(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or] (d) engage in conduct that is prejudicial to the administration of justice."

The respondent filed an answer and personally appeared with counsel at the hearing conducted by the panel. After hearing the evidence, the panel made the following findings of fact and conclusions of law:

*"Findings of Fact*

. . . .

"5.  . . . The Kansas Supreme Court admitted the respondent to the practice of law in the State of Kansas on September 20, 1990. In 1991, the Missouri Supreme Court admitted the respondent to the practice of law in the State of Missouri.

"6.  In 1990, the respondent went to work for Wallace, Saunders, Austin, Brown & Enochs (hereinafter 'the firm'). In 1996, the respondent became a shareholder of the firm.

"7.  Sometime after [her] admission to the Kansas bar in 2005, the firm employed J.A., a young attorney, as an associate. In December, 2007, the respondent and J.A. began an intimate relationship. At the time, the respondent and J.A. were married to other individuals.

"8.  Unfortunately, J.A. suffered from depression and chronic alcohol abuse. J.A. received treatment on an outpatient basis from Shawnee Mission Medical Center.

"9.  In 2011, J.A. left her employment with the firm. The respondent and J.A. continued their relationship after J.A. left the firm and they discussed marriage at a future date.

"10.  J.A.'s chronic alcohol abuse continued and her family assisted in enrolling her in Valley Hope for inpatient alcohol abuse treatment. While J.A. was in inpatient treatment, the respondent visited J.A. and participated in her treatment as a family member. On January 20, 2012, Valley Hope discharged J.A. from inpatient treatment. The respondent attended J.A.'s graduation from treatment.

"11.  On Thursday, January 26, 2012, J.A. relapsed and began consuming alcoholic beverages. On January 27, 2012, at dinner, the respondent and J.A. consumed a bottle of wine together.

"12.  The respondent and J.A. spent the following day together and each drank an alcoholic beverage together while watching a sporting event on television. Later, they attended an Alcoholics Anonymous meeting together and did not consume any additional alcoholic beverages that day.

"13.  On Sunday, January 29, 2012, the respondent and J.A. again spent the day together. They had lunch at the Plaza in Kansas City, Missouri, where they drank champagne and sampled new flavored tequilas. After walking around on the Plaza smoking cigars, the respondent and J.A. drove to [a] restaurant with a bar in J.A.'s neighborhood, in separate cars. At the neighborhood restaurant, the respondent and J.A. sat at the bar and ordered dinner. The respondent and J.A.

each consumed vodka martinis, three or four shots of alcohol, and a big glass of Port while sitting at the bar.

"14. The respondent drove J.A. from the restaurant to her apartment. They left J.A.'s car at the restaurant. As a romantic gesture, the respondent carried her from her car to her apartment. The respondent set J.A. down on the landing inside her front door, in a sitting position, said goodnight, and went to his residence. The landing inside the front door of the apartment is at the bottom of stairs.

"15. The next morning, J.A. did not answer her telephone. The respondent was worried that she got up and started drinking, so he went to her apartment to check on her. The respondent arrived at J.A.'s apartment at approximately 8:40 a.m. The door was unlocked. When the respondent opened the door, he found J.A. lying on the floor of the landing.

"16. Initially, the respondent could not see J.A.'s face because it was covered by her hair. The respondent attempted to wake J.A. He grabbed her under her armpits and lifted her up and saw that her face was blue. The respondent put his finger in her mouth to see if something was in her throat keeping her from breathing, but he did not find anything. The respondent noticed that her body was cold and he knew that she had died. While the respondent was holding J.A., her bodily fluids soiled his clothing.

"17. After the respondent realized that she was dead, he was afraid to call J.A.'s mother. He knew that J.A.'s family would blame him for allowing her to consume alcoholic beverages. The respondent did not want J.A.'s family to know that he and J.A. had consumed alcoholic beverages together the night before. The respondent was fearful of a violent reaction by certain members of J.A.'s family. In order to conceal information from J.A.'s family, the respondent deleted text messages from J.A.'s telephone.

"18. The respondent walked to the restaurant where they ate and drank at the night before and drove J.A.'s car from the restaurant to J.A.'s apartment. After returning J.A.'s car to her parking lot, the respondent left J.A.'s phone and keys in her car. Then, the respondent drove away from J.A.'s apartment without calling the authorities or J.A.'s family.

"19. The respondent drove toward his home. While he was driving, he called his former law partner, Pat McGrath. It took some time for the respondent to reach Mr. McGrath. However, after getting in touch with Mr. McGrath and after telling Mr. McGrath what happened, Mr. McGrath told him to go back and call for emergency assistance.

"20. The respondent proceeded home to change his pants. After changing clothes, the respondent returned to J.A.'s apartment. Once there, the respondent called for emergency assistance. The respondent placed the 911 call at 11:21 a.m. The respondent also called J.A.'s mother.

"21. At some point, the respondent also deleted the text message conversation between the respondent and J.A. on the respondent's telephone.

"22. When questioned at the scene by the police officers, the respondent provided false information. The respondent falsely told the police officers that he

found her deceased at 11:20 a.m. The respondent also falsely told the police officers that the last time he saw J.A. was at the Plaza the day before at 5:30 p.m. Finally, the respondent falsely told the police officers that they had not consumed any alcoholic beverages together the day before. In addition to the false statements, the respondent failed to inform the police officers that he discovered J.A.'s deceased body at 8:40 a.m., that in an attempt to wake her he had moved her body, that he had retrieved her car from the restaurant, and that he had driven home to change clothes before returning to her apartment and calling for emergency assistance.

"23.   The respondent knew that he should have been honest with the investigating officers. The next day, Monday, January 31, 2012, the respondent contacted attorney Tom Bath and told Mr. Bath what had occurred [and] that the respondent wanted Mr. Bath to schedule an appointment with the investigating officers so that the respondent could correct his false statements.

"24.   Mr. Bath made the necessary arrangements and on February 1, 2012, the respondent met with the investigating officers and told the officers the truth.

"25.   According to the report of the medical examiner, J.A.'s cause of death was cervical spine fracture due to a fall down stairs. The medical examiner indicated that ethanol intoxication was a contributing factor to J.A.'s death.

"26.   On June 14, 2012, S.K., J.A.'s uncle, filed a complaint against the respondent on behalf of himself, his wife, J.A.'s mother, and J.A.'s step-father, asserting that the respondent provided false information to law enforcement officers.

"27.   On July 16, 2012, the respondent provided a written response to S.K.'s complaint. In his response, the respondent admits that he provided false information to the law enforcement officers. The respondent explained that he provided false information to the law enforcement officers only because he wanted to keep the information from J.A.'s family for fear of how they would react to that information.

*"Conclusions of Law*

"28.   Ms. Knoll alleged that the respondent violated KRPC 8.4(b), KRPC 8.4(c), and KRPC 8.4(d). As discussed below, the hearing panel concludes that the respondent's conduct did not violate the rules alleged.

### "KRPC 8.4(b)

"29.   'It is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.' KRPC 8.4(b). Ms. Knoll alleged that the respondent violated Mo. Rev. Stat. § 575.100, tampering with physical evidence.

'1.   A person commits the crime of tampering with physical evidence if he:

'(1) Alters, destroys, suppresses or conceals any record, document or thing with purpose to impair its verity, legibility or availability in any official proceeding or investigation; or

'(2) Makes, presents or uses any record, document or thing knowing it to be false with purpose to mislead a public servant who is or may be engaged in any official proceeding or investigation.

'2. Tampering with physical evidence is a class D felony if the actor impairs or obstructs the prosecution or defense of a felony; otherwise, tampering with physical evidence is a class A misdemeanor.'

Possessing all of the facts available to the hearing panel and after interviewing the respondent, the authorities in Missouri did not charge the respondent with a violation of Mo. Rev. Stat. § 575.100. Based upon the evidence presented at the hearing, the hearing panel concludes that the respondent did not violate Mo. Rev. Stat. § 575.100. Accordingly, the hearing panel concludes that the respondent did not violate KRPC 8.4(b).

### "KRPC 8.4(c)

"30. 'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). In this case, the respondent did engage in dishonest conduct—he provided false information to the investigating officers in his first statement to them. However, the hearing panel concludes that the respondent's reaction to the situation was a completely human reaction to an emotionally charged situation. During the hearing, a full 16 months following J.A.'s death, it was clearly and painfully obvious to the hearing panel how deep the respondent's feelings were and how profoundly he has been affected by her death.

"31. The hearing panel concludes the respondent's conduct was an isolated incident of dishonest conduct which he realized was wrong and corrected in a short period of time. The respondent's conduct did not harm a client nor did it harm the legal profession and is not representative of the respondent's practice. According to the evidence presented, the respondent's approach to, and reputation in the practice of law is impeccable. Accordingly, the hearing panel concludes that the respondent did not violate KRPC 8.4(c) by providing false information to the investigating officers.

### "KRPC 8.4(d)

"32. 'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent's conduct in this case did not prejudice the administration of justice. Within 48 hours of his initial statement to law enforcement, the respondent corrected his false statements. The prime focus of the investigation centered around the medical examiner's report. The medical examiner's report was not released until March 14, 2012. Thus, at most, the respondent's conduct could have had only a minimal

impact on the investigation. Thus, the hearing panel concludes that the respondent did not violate KRPC 8.4(d).

"33.  Because the hearing panel concludes that the respondent did not violate KRPC 8.4(b), KRPC 8.4(c), or KRPC 8.4(d), the hearing panel dismisses the complaint against the respondent."

## ANALYSIS

The Disciplinary Administrator appeals the hearing panel's dismissal pursuant to Supreme Court Rule 211(f) (2013 Kan. Ct. R. Annot. 356) and argues that the hearing panel erred in concluding that Mintz did not violate KRPC 8.4(c) and KRPC 8.4(d). The Disciplinary Administrator abandons any arguments pertaining to KRPC 8.4(b).

## STANDARD OF REVIEW

In a disciplinary proceeding, this court considers the evidence, the findings of the hearing panel, and the arguments of the parties and determines whether violations of the KRPC exist, and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Ireland*, 294 Kan. 594, 604, 276 P.3d 762 (2012); *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f).

Clear and convincing evidence is " 'evidence that causes the fact-finder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]). Thus, the hearing panel's report will be adopted " 'where amply sustained by the evidence, but not where it is against the clear weight of the evidence.' " *In re Walsh*, 286 Kan. 235, 246, 182 P.3d 1218 (2008). Generally, this court considers the hearing panel's findings of fact, conclusions of law, and recommendation to be advisory but gives the final hearing report the same dignity as a special verdict by a jury or the findings of a trial court. *In re Frahm*, 291 Kan. 520, 525, 241 P.3d 1010 (2010).

## KRPC 8.4(c)

First, the Disciplinary Administrator contends that Mintz violated KRPC 8.4(c), which provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud,

deceit or misrepresentation." In the formal complaint, the Disciplinary Administrator set forth 327 allegations of conduct. Mintz admitted 326 of the allegations, which included dishonest and deceptive conduct.

The Disciplinary Administrator highlights that Mintz made deceptive statements to law enforcement officers who investigated J.A.'s unattended death. Further, he admittedly delayed calling law enforcement—waiting over 2 and ½ hours—after discovering J.A.'s body. During the lapsed time period, Mintz took J.A.'s car keys and cell phone and walked back to the bar where J.A.'s car had been parked the previous night. He drove J.A.'s car back to her apartment complex and parked it. Then, Mintz drove home in his own vehicle and changed clothes. Significantly, Mintz deleted all text messages between himself and J.A. from both her cell phone and his own cell phone. He admitted that all of these actions were done in order to "cover my ass."

During Mintz' sworn interview with Special Investigator Terry Morgan of the Disciplinary Administrator's Office, Mintz explained: "I didn't think that [they] would ultimately conclude anything had been done wrong, but as a lawyer just not saying the truth is enough to sometimes be a problem. I would have never done that. My only concern was keeping it from [J.A.'s] family these facts." Later, he added: "I felt to keep these facts from her family was going to be acceptable to them and it would also avoid me having to be confronted by them, which was something I was concerned about both physically and to have to disappoint." As the Disciplinary Administrator notes, these comments indicate Mintz intended to knowingly and intentionally withhold information during the investigation into J.A.'s death.

Hence, there is clear and convincing evidence that Mintz engaged in deceptive conduct and, consistent with this evidence, the hearing panel found that Mintz "did engage in dishonest conduct—he provided false information to the investigating officers in his first statement to them." Nevertheless, the panel concluded that Mintz' dishonest conduct did not result in a violation of KRPC 8.4(c) because his "reaction to the situation was a completely human reaction to an emotionally charged situation."

Mintz, in arguing the hearing panel's conclusion was appropriate, contends the Disciplinary Administrator attempts to impose too strict an interpretation of KRPC 8.4(c), and he argues that "not every action involving dishonesty should rise to the level of misconduct" invoking the application of the KRPC. Mintz suggests the Disciplinary Administrator's interpretation casts such a wide net that any lawyer who lied to anyone for any reason would be subject to discipline: "No one would suggest that a lawyer should be disciplined for being dishonest with their spouse about why they were late from work, lying to their dentist about the frequency with which they floss or other clearly minimal infractions having no relevancy to the practice of law." His lapse, he argues, should be excused because of the emotional circumstances in which it is made, which had no relationship to the practice of law.

The Disciplinary Administrator seemingly agrees that not all acts of dishonesty warrant discipline and cites a federal case, *Apple Corps Ltd. v. International Collectors Soc.*, 15 F. Supp. 2d 456 (D. N.J. 1998), that suggests a dividing line between acts of dishonesty warranting discipline and those that do not. In *Apple Corps Ltd.*, a federal district court indicated 8.4(c) " 'should apply only to grave misconduct that would not only be generally reproved if committed by anyone, *whether lawyer or nonlawyer*, but would be considered of such gravity as to raise questions as to a person's *fitness to be a lawyer*.' " (Emphasis added.) *Apple Corps Ltd.*, 15 F. Supp. 2d at 476.

Here, the Disciplinary Administrator focuses on the language in *Apple Corps Ltd.* to argue that Mintz engaged in a pattern of such grave dishonest conduct by deceiving J.A.'s family and providing false statements to law enforcement. The Disciplinary Administrator stresses that Mintz "engaged in a series of thought-out actions that were calculated to alter the scene of an unattended death in order to deceive J.A.'s family and law enforcement. This was not a reaction." Mintz should, according to the Disciplinary Administrator, be "professionally answerable for a pattern of conduct that indicates an indifference to an obligation of truthfulness and honesty that is required under the KRPC." In other words, Mintz' dishonest conduct raised questions about his fitness to be a lawyer.

Mintz responds that his dishonesty should not be characterized as a pattern of misconduct. Instead, this was an isolated incident that comprised an emotionally charged reaction to a tragic and debilitating event in his life. He further argues that the federal district court's interpretation of 8.4(c) in *Apple Corps Ltd.* supports the hearing panel's decision because grave misconduct that would be "generally reproved of" should not encompass human frailty in a moment of crisis. See *Apple Corps Ltd.*, 15 F. Supp. 2d at 476.

We need not decide in this case whether we would adopt the *Apple Corps Ltd.* reading of 8.4(c) or address the full breadth of the net cast by our disciplinary rules because the nature of the dishonest conduct in this case is addressed in our past cases. Several cases can be cited in which this court has determined discipline is warranted when a deceptive statement is made to a law enforcement officer or deceptive actions are taken during the course of an investigation conducted by a law enforcement agency.

For example, in the case of *In re Millett*, 291 Kan. 369, 377, 241 P.3d 35 (2010), this court adopted a hearing panel's finding that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation and violated KRPC 8.4(c) when he " 'made a false statement to the detectives' " by stating he had not rewound a cassette tape and recorded over a police interview with the person whom the attorney had accompanied to the interview. In another case, in *In re Arabia*, 283 Kan. 851, 857, 860, 156 P.3d 652 (2007), an attorney " 'engaged in conduct that involved dishonesty when he provided false information to [a] Detective' " and thus violated KRPC 8.4(c).

In other cases, an attorney's deceptive acts or statements made during a law enforcement investigation have led to discipline for violations of a different subsection of KRPC 8.4, specifically 8.4(b) (2013 Kan. Ct. R. Annot. 655), which applies to the commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer. Most recently, in *In re Harrington*, 296 Kan. 380, 293 P.3d 686 (2013), an attorney lied to law enforcement officers about the circumstances of an automobile accident and consequently was convicted of misdemeanor obstruction of official duty. Additional convictions arose from the accident,

including misdemeanor battery and driving under the influence. This court did not separately discuss Harrington's obstruction conviction in determining that she committed criminal acts that reflected adversely on her honesty, trustworthiness, or fitness as a lawyer, but her dishonesty obviously weighed in favor of the conclusion. Similarly, in *In re Frahm*, 291 Kan. 520, an attorney was convicted of two counts of aggravated battery and of driving under the influence after he caused an injury accident. Frahm had left the scene of the accident and had denied any involvement when initially questioned by a law enforcement officer. In finding that Frahm had violated KRPC 8.4(b), the court focused on his criminal convictions but also emphasized that Frahm "left the scene of the accident because he hoped he could thereby avoid prosecution for driving while intoxicated." *In re Frahm*, 291 Kan. at 526.

*Harrington* and *Frahm* are obviously distinguishable because in each of those cases the respondent attorney had criminal convictions and Mintz does not. Nevertheless, the structure of KRPC 8.4 reveals the drafters' intent to cover both a situation where an attorney's dishonesty leads to a criminal conviction and a situation where no criminal charges are brought. See American Bar Association Standards for Imposing Lawyer Sanctions, Standard 5.11, Comment (2012) (ABA Standards) (discipline is to be imposed for intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice "regardless of whether a criminal charge has been brought against the lawyer"). Consequently, we deem these cases to be instructive and view them as dispelling three of Mintz' arguments.

First, *Harrington* and *Frahm*, along with *Millett* and *Arabia*, implicitly recognize that an attorney's truthfulness when dealing with a law enforcement investigation is to be considered in assessing honesty that reflects adversely on one's fitness as an attorney. As this court recently emphasized, "[a]s officers of the court, lawyers must abide by the rules that 'shape' the administration of justice." *In re Kline*, 298 Kan. 96, 215, 311 P.3d 321 (2013) (citing ABA Standards, 462). Two of those fundamental rules are that all citizens must be honest when answering questions asked by law en-

forcement officers and no citizen will destroy evidence that is potentially material to an investigation. Attorneys who have been granted the privilege of practicing law are expected, even trusted, to adhere to these basic rules that shape our justice system. In short, dishonesty when dealing with law enforcement officers who are conducting an investigation is not a grey area where KRPC 8.4 might be inapplicable.

Second, the cases reflect that trauma and stress do not excuse a lack of honesty when dealing with law enforcement officials. Both Harrington and Frahm were dealing with the illness of addiction, and both respondents had experienced the trauma of an automobile accident. Further, aside from their dishonest responses to the accidents, there was no indication that these attorneys had otherwise engaged in dishonest conduct or had engaged in dishonest conduct related to their representation of clients. In fact, a mitigating circumstance in both cases was the respect each attorney had achieved among his or her peers in the legal community. *In re Harrington*, 296 Kan. at 383; *In re Frahm*, 291 Kan. at 523. Hence, it could be said that Harrington and Frahm reacted to an emotionally charged situation and their reactions were the result of stress and human frailty rather than a character flaw. Yet, neither circumstance excused them, as officers of the court, from honestly dealing with law enforcement officers conducting an investigation.

Finally, *Harrington* and *Frahm* illustrate that discipline can be appropriate even if the unethical acts are unrelated to the representation of a client. These cases are not unique. In many cases, we have recognized that violations of the KRPC can occur for dishonest conduct outside the practice of law. In *In re Johnson*, 240 Kan. 334, 337, 729 P.2d 1175 (1986), a contested disciplinary case in which this court imposed sanctions for false and misleading statements during an election campaign, this court explained:

"A lawyer is bound by the Code of Professional Responsibility in every capacity in which the lawyer acts, *whether he is acting as an attorney or not*, and is subject to discipline *even when involved in nonlegal matters*, including campaigns for nonjudicial public office. *State v. Russell*, 227 Kan. 897, 610 P.2d 1122, *cert. denied* 449 U.S. 983 (1980). The imposition of the ethical obligation of honesty upon lawyers under DR 1-102(A)(4) is necessary for the administration of justice.

See cases cited in *State v. Russell*, 227 Kan. at 900-901. Disciplinary action can be exercised not only for the purpose of enforcing legal rights but for the additional purpose of *enforcing honorable conduct* on the part of the court's own officers. *In re Estate of Williams*, 160 Kan. 220, 160 P.2d 260 (1945)." (Emphasis added.)

Consequently, there is no merit to an argument that discipline is inappropriate simply because an attorney acted outside of his or her professional capacity and the offending conduct "could not reasonably affect [the] representation of clients or interfere with the administration of justice." *In re Johnson*, 240 Kan. at 339. Instead, "[l]awyers are subject to discipline for improper conduct in business activities, individual or personal activities, and activities as a judicial, governmental, or public official. Improper conduct *in any activity* can affect an attorney's professional capacity." (Emphasis added.) *In re Johnson*, 240 Kan. at 339; see *In re Jones*, 252 Kan. 236, 239, 843 P.2d 709 (1992) (the fact that respondent took money from his employer and not a client was immaterial because "lawyers are subject to discipline for improper conduct in individual, personal, or business activities"); see also *In re Blase*, 260 Kan. 351, 920 P.2d 931 (1996) (Disciplinary Administrator appealed dismissal of complaint; this court found respondent violated MRPC 8.4[c] in connection with check-kiting scheme involving truck stop of which lawyer was 25 percent owner).

In summary, the facts, the KRPC, and Kansas law lead to the conclusion that Mintz' dishonest conduct violated KRPC 8.4(c). The law and the weight of the evidence go against the hearing panel's conclusion that there was no violation. Clear and convincing evidence supports the conclusion that Mintz engaged in deceptive practices and made untruthful statements during a law enforcement investigation. The panel's emphasis on the isolated nature of the conduct, the nature of the harm, Mintz' general reputation as an attorney, and the fact that the deception occurred under stress do not change the conclusion that a violation of KRPC 8.4(c) occurred. If anything, some or all of these factors are circumstances to be considered in determining the appropriate discipline to be imposed for violating KRPC 8.4(c).

*KRPC 8.4(d)*

The second violation at issue in this case is based on KRPC 8.4(d) (2013 Kan. Ct. R. Annot. 656), which provides: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." The hearing panel found that Mintz' conduct "could have had only minimal impact on the investigation," in part because "[t]he prime focus of the investigation centered around the medical examiner's report" which was not released until March 14, 2012, and because Mintz talked to detectives and corrected his statements on February 1, 2012.

In asking us to reject this reasoning, the Disciplinary Administrator argues the hearing panel's findings are not supported by clear and convincing evidence. First, the Disciplinary Administrator urges us to reject the hearing panel's finding regarding the focus of the law enforcement investigation. The Disciplinary Administrator notes that the medical examiner was mentioned only twice in passing during Mintz' second interview with law enforcement. The first time, a detective explained:

"[W]e are required to investigate because the bottom line of the whole thing is that we want to make sure that what we see and observe at the crime scene and the interviews that we conduct that everything makes logical sense. And then, of course, a medical examiner will make a final ruling on whether they rule homicide or accidental or suicide or something like that."

The detective mentioned the medical examiner a second time, stating the following:

"We just have to make absolutely sure that this is not some foul play kind of situation. So, you know, a big chunk of it is we're going to depend upon the medical examiner and their ruling.

. . . .

"But, like I said, I'm really glad you . . . came in here just so that we could clarify because this had the ink written all over it."

The Disciplinary Administrator argues that the detective's statements show that, at least in the initial phase of the investigation, law enforcement's primary focus was not so much on the anticipated medical examiner's report but on whether the scene at J.A.'s

apartment matched the information that had been provided by Mintz.

We agree that the record reflects the law enforcement officers were trying to sort out whether Mintz' statement fit with the forensic evidence. Further, while Mintz' eventual correction of his statement mitigated the impact of his misconduct, his failure to immediately correct his statement left the officers with false information that had to be sorted through during the early hours of the investigation. Thus, Mintz' deceptive acts and practices impeded the investigation, a fact the hearing panel recognized but minimized.

Likewise, Mintz emphasizes the minimal and temporary impact his actions had on the investigation and raises several other arguments in urging us to adopt the hearing panel's findings. He emphasizes that he contacted two lawyers for advice—Pat McGrath and Tom Bath, a criminal defense lawyer whom he contacted the following day. He eventually followed their advice, and according to him, corrected his conduct before there was any harm to the investigation. He again emphasizes his conduct was not related to his representation of a client.

While we recognize the existence of these various circumstances, they do not persuade us that Mintz did not violate KRPC 8.4(d). Several factors lead to our conclusion.

First, we note the record does not establish that Mintz fully remediated his deception. For example, the record does not tell us whether the police were able to fully recover the evidence lost when Mintz deleted text messages from his and J.A.'s cell phones. More significantly, it can never be definitely established what information was lost by Mintz' actions.

In addition, even if we were to assume that the police investigation was not prejudiced by Mintz' dishonesty, this court has rejected the notion that the conduct must harm a specific proceeding or event in order to constitute a KRPC 8.4(d) violation. See *In re Kline*, 298 Kan. at 121. This court has suggested that the rule prohibiting conduct that prejudices the administration of justice is "violated when an attorney makes a false statement which, in any way, has a bearing on the legal process." *In re Johnson*, 240 Kan. at 342;

see *In re Kline*, 298 Kan. at 121 ("We conclude KRPC 8.4[d] encompasses conduct that injures, harms, or disadvantages the justice system generally, regardless of the context in which that conduct occurs or whether it prejudiced a particular proceeding."); *In re Pyle*, 283 Kan. 807, 829-30, 156 P.3d 1231 (2007) (KRPC 8.4[d] prohibits actions that broadly injure the justice system.). Here, there is clear and convincing evidence that Mintz made false statements to law enforcement and that these false statements had a bearing on the legal process.

Further, we are no more persuaded by Mintz' argument regarding the lack of a connection to a client with regard to a KRPC 8.4(d) violation than we were when considering this argument in the context of KRPC 8.4(c). Making false statements to a law enforcement officer harms the administration of justice regardless of whether a client is the target of or impacted by the investigation. In any context, destruction of evidence or an attempt to hide evidence is an act impacting the administration of justice and warranting discipline.

Finally, Mintz argues that his dishonest statements were the product of concern about the reaction of J.A.'s family, not the intricacies of a police investigation. There is support for Mintz' argument in the record. During Mintz' second interview, he told officers: "I'm concerned about [J.A.'s] mother's husband and their family, the unstableness. He called me up drunk one day and he's an angry man." He notes that the hearing panel recognized the emotionally charged situation when it stated: "During the hearing, a full 16 months following J.A.'s death, it was clearly and painfully obvious to the hearing panel how deep the respondent's feelings were and how profoundly he has been affected by her death." Again, however, we see this as a mitigating factor and not a basis for us to ignore the hearing panel's recognition that Mintz' false statements impacted the investigation.

We conclude that Mintz violated KRPC 8.4(d).

## DISCIPLINE

Having found violations of the KRPC, we must determine the appropriate discipline. This court is not bound by the recommen-

dations made by the Disciplinary Administrator or the hearing panel. Supreme Court Rule 212(f) (2013 Kan. Ct. R. Annot. 375). Each disciplinary sanction is based on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case. *In re Bishop*, 285 Kan. 1097, 1108, 179 P.3d 1096 (2008).

Generally, in determining the appropriate level of discipline, this court considers the factors outlined by the ABA Standards. See *In re Woodring*, 289 Kan. 173, 180, 186, 210 P.3d 120 (2009) (discussing and applying ABA Standards); *In re Rumsey*, 276 Kan. 65, 78-79, 71 P.3d 1150 (2003) (citing and discussing ABA Standards). Although not mandated by this court's rules, the ABA Standards are guidelines to assist the court and disciplinary panels in selecting appropriate and uniform discipline while recognizing that the appropriate discipline depends upon the facts and the aggravating and mitigating factors of each case. See *In re Baker*, 296 Kan. 696, 705, 294 P.3d 326 (2013); *In re Keithley*, 252 Kan. 1053, 1057, 850 P.2d 227 (1993). Consequently, a discussion of the ABA Standards guides our consideration of the appropriate discipline.

Under the ABA Standards, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

• *Duty Violated.* Although a client was not impacted, Mintz violated basic rules that shape the legal system and, in doing so, he violated duties owed to his profession, to law enforcement, and to the judicial system.

• *Mental State.* The Disciplinary Administrator argues that Mintz "knowingly and repeatedly engaged in dishonest conduct." See *In re Kline*, 298 Kan. at 216 (observing that the ABA Standards "identify three mental states: 'intent,' the highest culpable mental state; 'knowledge,' the intermediate culpable mental state; and 'negligence,' the least culpable mental state"). Mintz argues he was suffering from an "emotional tragedy" which affected his state of mind. While we do not question that Mintz was very distressed, it cannot be ignored that he reacted in a way that required calculation. Over a period of several hours, he took several deliberate,

deceptive steps, all of which were aimed at an attempt to hide his associations with J.A.'s drinking in the hours before her death. Mintz retrieved J.A.'s keys and cell phone, walked several blocks to retrieve her car, and erased text messages. Then, despite being advised by an attorney to return immediately to the scene and notify 911, he went to his home, changed his clothes, and delayed notifying officials. These actions were deliberate and knowing. Further, Mintz' statements to the Disciplinary Administrator's investigator reveal an understanding of an attorney's obligation to be truthful and also indicate he made the deceptive comments with an understanding that not telling the truth violated an attorney's duty, even if it does not result in harm to a client.

• *Injury.* The Disciplinary Administrator notes that under the ABA Standards, in a case where a lawyer tampers with evidence, the injury is measured by evaluating the level of interference or potential interference with the legal proceeding. The Disciplinary Administrator argues that Mintz' actions of deleting texts and moving J.A.'s vehicle altered the scene and "misdirected and delayed" the investigation. Mintz points out that he was not criminally charged with tampering with evidence and that the hearing panel found he did not violate KRPC 8.4(b) (2013 Kan. Ct. R. Annot. 655), a decision which the Disciplinary Administrator did not appeal. Regardless of the lack of criminal or civil charges, Mintz' argument that his actions did not affect the investigation is disingenuous. He was told by law enforcement that his false story "had the ink written all over it." In other words, his version was not adding up and was affecting the investigation. As we have noted, we cannot fully discern the harm based on the record before us. That said, there is not clear and convincing evidence of serious harm caused by Mintz' actions.

*Aggravating or Mitigating Factors*

Finally, under the ABA Standards, aggravating and mitigating circumstances are to be considered. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching a decision regard-

ing the appropriate discipline, the Disciplinary Administrator suggests the following aggravating factors apply:

*Aggravating Factors*

1. *Dishonest or Selfish Motive.* The Disciplinary Administrator argues that Mintz engaged in dishonest and deceitful conduct to conceal his actions that directly related to J.A.'s death. Mintz agrees that he was dishonest and that his motive was personal. But he argues that his actions "were in no way related to his activities as a lawyer[,] nor do they represent his character or fitness to practice law." We disagree. Mintz' conduct cannot be characterized as anything other than dishonest and selfish and, as we have discussed, we believe honesty when dealing with law enforcement officers who are conducting an investigation is a fundamental rule that shapes the administration of justice and one that attorneys are expected to comply with in all walks of their lives.

2. *Pattern of Misconduct.* The Disciplinary Administrator argues that Mintz engaged in a pattern of misconduct by, over a period of hours, intentionally altering the scene surrounding J.A.'s death, lying to law enforcement, and failing to immediately correct his statements. Mintz argues that his actions do not qualify as a pattern of misconduct because there was a short time period between his giving false statements and correcting those statements and the actions were related to one incident. We agree with Mintz that there was not a pattern of misconduct.

3. *Multiple Offenses.* We have concluded Mintz violated both KRPC 8.4(c) (2013 Kan. Ct. R. Annot. 655) and KRPC 8.4(d), although the import of the multiple violations is mitigated by the fact that both violations arise from the same conduct.

4. *Submission of False Evidence, False Statements, or Other Deceptive Practices During Disciplinary Process.* The Disciplinary Administrator says Mintz had a "pattern of omitting specific facts relating to the consumption of alcohol" during the disciplinary process. But the Disciplinary Administrator merely notes that Mintz wrote in his initial response to the allegations of misconduct that he " 'saw [J.A.] to the door,' when, in fact, he carried her to the door." There is no mention of how this shows a "pattern" or how

this particular detail is significant. Mintz notes that the Disciplinary Administrator fails to cite any support in the record showing a pattern of omissions during the disciplinary process. Mintz further emphasizes that he admitted to the factual allegations in the formal complaint. We conclude that this aggravating factor does not apply.

5. *Refusal to Acknowledge Wrongful Nature of Conduct.* The Disciplinary Administrator points out that Mintz admitted his deceptive actions but not any KRPC violations. As we consider this factor, we are influenced by the fact the hearing panel agreed with Mintz' position and concluded that although he acted dishonestly and minimally impeded the investigation of J.A.'s death, his actions were excused by the circumstances. We decline to consider Mintz' good-faith defense as an aggravating factor when he agreed to the truthfulness of the facts on which the Disciplinary Administrator relies and admitted he was dishonest and deceptive.

6. *Vulnerability of the Victim.* The Disciplinary Administrator argues that the "legal profession, law enforcement and the legal system were impacted due to the respondent's acts of altering evidence and misleading law enforcement." Noting this, Mintz argues "[t]he Petitioner's assessment of who was affected by Respondent's activity does not suggest vulnerability of a victim." We agree with Mintz and conclude this factor does not apply.

7. *Substantial Experience in the Practice of Law.* The Disciplinary Administrator notes that Mintz got his law license in 1990. Mintz does not dispute the fact that he has substantial experience, but he argues that the "allegations do not relate to the practice of law, but to a personal matter." Nevertheless, the heart of this matter relates to Mintz' interaction with other officers of the legal system and to his honesty, an attribute that is central to an attorney's fitness to practice law.

8. *Illegal Conduct, Including that Involving the Use of Controlled Substances.* The Disciplinary Administrator argues that this factor applies because Mintz lied to law enforcement and altered the death scene. Mintz responds that this factor is inapplicable because there was no finding of illegal conduct. A conviction or even a criminal charge is not necessary, however. See *In re Depew*, 290 Kan. 1057, 1072, 237 P.3d 24 (2010); *In re Hertach*, 279 Kan. 469,

479, 109 P.3d 1218 (2005). Nevertheless, the hearing panel did not find a KRPC violation based on any illegal conduct, and the Disciplinary Administrator chose not to pursue a violation of KRPC 8.4(b) (commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects) in its arguments to this court. Given that, we give little weight to this factor.

Hence, the only aggravating factors that carry much weight are Mintz' dishonesty and his selfish motivation. But the import of aggravating and mitigating circumstances is not determined by tallying numbers, and dishonesty and selfish motive weigh heavily as aggravating factors.

These aggravating factors must be considered in light of mitigating factors, which may justify a reduction in the degree of discipline to be imposed. In his brief, the Disciplinary Administrator does not address any mitigating factors. Mintz suggests that if this court decides that discipline is appropriate, the following mitigating factors or circumstances should be considered:

*Mitigating Factors*

1. *Absence of Prior Disciplinary Record.* Mintz notes that he has had no prior discipline.

2. *Absence of a Dishonest or Selfish Motive.* Mintz points this court back to his response to the Disciplinary Administrator's aggravating factor argument in which the administrator contends that Mintz' actions were both dishonest and selfish. He contends that his actions were "in no way related to his activities as a lawyer[,] nor do they represent his character or fitness to practice law." Nevertheless, Mintz does not dispute that his actions were dishonest and involved a personal motive.

3. *Personal or Emotional Problems.* Mintz acknowledges that he does not generally suffer from personal or emotional problems, but he suggests that "clearly the situation at issue was a traumatic event that resulted in emotional distress" for Mintz. We recognize that Mintz' actions were situational and acknowledge the traumatic and emotional situation.

4. *Timely Good-Faith Effort to Make Restitution or to Rectify Consequences of Misconduct.* Mintz contends that this factor is relevant because, according to Mintz, he "immediately" sought help by contacting counsel and following the advice of counsel to mitigate the impact of his actions. These circumstances hardly rectify the situation, however. As we have noted, it is impossible to fully rectify the damage caused by altering a scene subject to investigation by law enforcement officers. Further, as the Disciplinary Administrator points out, Mintz' actions were not immediate, especially with regard to McGrath, his initial contact; instead, he ignored McGrath's advice.

5. *Full and Free Disclosure to Disciplinary Board or Cooperative Attitude Toward Proceedings.* Mintz notes that he stipulated to the factual basis of this disciplinary matter.

6. *Character or Reputation.* The hearing panel found Mintz' reputation as a lawyer is "impeccable," a fact supported by the numerous letters of support from fellow lawyers that were submitted to the hearing panel.

7. *Remorse.* Mintz admitted his remorse for the actions he took in relation to discovering J.A.'s death.

APPROPRIATE DISCIPLINE

When weighing these factors, we next consider the applicable disciplinary standards. The Disciplinary Administrator suggests that this court should consider ABA Standard 5.11, which relates to disbarment and states:

"5.11   Disbarment is generally appropriate when:

"(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft . . . .

"(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

The Comment to ABA Standard 5.11 provides: "This duty to the public is breached regardless of whether a criminal charge has been brought against the lawyer." Again, this confirms the fact that the ABA Standards do not require that a respondent be charged or

convicted before conduct may be considered illegal. Further, the "fact that an individual is not charged or convicted does not mean that the individual's acts did not violate a criminal statute." *In re Depew*, 290 Kan. at 1072 (citing *In re Farrell*, 271 Kan. 291, 21 P.3d 552 [2001]).

The Disciplinary Administrator also cites ABA Standard 7.1, which states:

> "Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."

The Disciplinary Administrator contends that disbarment is appropriate because Mintz "admitted to lying to law enforcement, deleting whole strings of texts, moving J.A.'s car and changing his clothes to make it appear he had not been with J.A." Further, Mintz admitted his actions were knowingly performed with an intent to "cover my ass."

Mintz urges this court to find that disbarment is too harsh a punishment for this first-time offense. We agree. Although Mintz acted knowingly and intentionally, it is difficult to conclude that Mintz "acted with 'conscious objective or purpose to accomplish a particular result' such that disbarment becomes the obvious, or correct, method of discipline." *In re Kline*, 298 Kan. at 228-29. Additionally, the conduct complained of occurred in a short period of time during which Mintz was under emotional distress. See *In re Jantz*, 243 Kan. 770, 774, 763 P.2d 626 (1988) (reduced punishment appropriate where conduct "took place within a very short period of time, there were no complaints against respondent prior to these incidents," conduct "took place when respondent was under severe emotional distress," and respondent promptly admitted misconduct and made restitution).

ABA Standard 7.2 provides that "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system." This court has indicated that when a lawyer's misconduct is clearly in-

tentional, some length of suspension from the practice of law is the appropriate sanction. *In re Swanson*, 288 Kan. 185, 215, 200 P.3d 1205 (2009); *In re Bishop*, 285 Kan. 1097, 1109, 179 P.3d 1096 (2008). But ABA Standard 6.12 makes the absence of remedial action significant:

> "Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding."

Here, Mintz knowingly engaged in dishonest conduct that had the potential of causing serious injury that interfered with a law enforcement investigation of an extremely serious matter involving the death of a human being. As we have noted, while Mintz took steps to correct his statements to law enforcement officers, it is impossible to turn back the clock and fully rectify his actions. Therefore, a majority of the court concludes suspension is appropriate and further concludes the suspension should be indefinite.

A minority of the court would impose a lesser sanction of censure or a defined period of suspension, concluding that this case is distinguishable from other cases relied on by the majority because there was no finding that Mintz' actions or statements significantly impacted the investigation, Mintz took remedial steps within 48 hours, he was not convicted of either obstruction or attempted obstruction of official duty, several mitigating factors weigh in Mintz' favor, and the punishment is disproportionate to the discipline imposed in similar cases. See ABA Standard 5.13 (reprimand or censure is appropriate when a lawyer knowingly engages in *other* conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on a lawyer's fitness to practice law); see also *In re Harrington*, 296 Kan. 380, 393-94, 293 P.3d 686 (2013) (plea-based misdemeanor conviction for obstruction of official duty based on misstatements to investigating officers; 2-year suspension with 3 months to be served and 21 months probated); *In re Millett*, 291 Kan. 369, 380, 241 P.3d 35 (2010) (misdemeanor conviction of obstruction of official duty by giving false statement to law enforcement officer regarding destroyed audiotape record-

ing; 2-year suspension imposed); *In re Frahm,* 291 Kan. 520, 531, 241 P.3d 1010 (2010) (convicted of driving under the influence and two counts of aggravated battery; left scene of accident; 3-year suspension made retroactive to date of temporary suspension based on felony convictions).

IT IS THEREFORE ORDERED that Robert A. Mintz be indefinitely suspended from the practice of law in the state of Kansas effective on the filing of this opinion in accordance with Supreme Court Rule 203(a)(2) (2013 Kan. Ct. R. Annot. 300).

IT IS FURTHER ORDERED that Mintz comply with Supreme Court Rule 218 (2013 Kan. Ct. R. Annot. 406), and in the event Mintz seeks reinstatement, he shall comply with Supreme Court Rule 219 (2013 Kan. Ct. R. Annot. 407).

IT IS FURTHER ORDERED that the costs of these proceedings are assessed to Mintz and that this opinion be published in the official Kansas Reports.